### E. C. CURLEY v. STATE OF FLORIDA

16 So. (2nd) 440                 June Term, 1943
August 3, 1943                      En Banc
Rehearing Denied February 18, 1944

*W. W. Flournoy,* for appellant.

*J. Tom Watson,* Attorney General, and *Woodrow M. Melvin,* Assistant Attorney General, for appellee.

PER CURIAM:
Judgment affirmed.

CHAPMAN, THOMAS, ADAMS and SEBRING, JJ., concur.

BUFORD, C. J., TERRELL and BROWN, JJ., dissent.

BROWN, J., dissenting:

An information was filed against the defendant on April 21, 1942, in the Circuit Court of Walton County, in two counts. The first count charged that the defendant, appellant here, "did practice *and advertise to practice* medicine," etc. At the close of the taking of testimony by the State the State Attorney nol prossed the first count. The second count on which the defendant was convicted, charged that the defendant "did practice medicine, he the said E. C. Curley not being then and there lawfully licensed and authorized to practice medicine in the State of Florida, by the State Board of Medical Examiners," etc. The defendant plead not guilty.

When the case came on for trial the defendant filed a motion for a continuance upon the ground that he was suffering from an illness resulting from an accident and was not well enough to undergo the trial. The court had him examined by a physician and also questioned him personally and decided that the motion should be denied. One of the assignments of error was based upon this ruling. Considerable latitude must be allowed to trial judges in passing upon such a motion for a continuance and we are not at all convinced that any abuse of this discretion was known. The court's action in this regard is therefore allowed to stand.

Section 458.15 Florida Statutes 1941, makes it a criminal offense for any person, not being then lawfully licensed or authorized to practice medicine in this State, to "practice or advertise to practice medicine."

Section 458.13 defines the practice of medicine in these words: "A person is practicing medicine within the meaning of this chapter, except as hereinafter stated, who holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition, or who shall offer or undertake by any means or method to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condi-

tion." Then follow numerous exceptions. It is provided that this statute shall not be construed to affect the furnishing of medical assistance in cases of emergency or the domestic administration of family remedies "or the practice of the religious tenets of any church." The statute also excepts from its operation nurses and mid-wives.

In its charge to the jury the court properly called the attention of the jury to the above statutes but he did not define to the jury the meaning of the words diagnose, treat, operate or prescribe, as used in the statute.

The word diagnose is defined as follows in Webster's unabridged Dictionary: "To ascertain by diagnosis, to recognize by its symptoms, as a disease; to make a diagnosis." According to the same Dictionary the word diagnose has a general meaning as follows: "Conclusion arrived at through critical perception or scrutiny; hence, keen understanding of appearances; as one's diagnosis of a situation." But the medical meaning of the word is given as follows: "The art or act of recognizing the presence of disease from its symptoms, and deciding as to its character; also the decision reached."

According to the same authority the word "treat" has many meanings. Among them, "to negotiate, to consider terms of accommodation, settlement or the like; to handle a subject, especially in writing or speaking; to discourse," etc. "To pay another's expenses for a meal;" etc. But of the many definitions of this word the one which comes nearest to giving the meaning as used in this statute is as follows: "Care for (a patient) medically or surgically," etc. Likewise the word "operate" has many meanings but we think that the medical and surgical meaning of this word is very well understood, such as on operation for appendicitis, etc. Likewise the word "prescribe" has many meanings. But the medical meaning according to the Dictionary is "To direct, designate or order the use of, as a remedy; as the doctor *prescribed* quinine;" and "To write or give a medical prescription."

Taking the testimony as a whole, including that of the State, our conclusion is that the testimony did not show that

this defendant was practicing medicine within the meaning of the statute. He never used or prescribed any drugs, nor did he use any instruments. About all that he usually did was to touch the body of persons who came to him, as many did, with his fingers at various points on the body, some times at one or two, some times at several points, meanwhile praying silently to himself. He believed that he had some marvelous power from on High to heal practically all of the ills of the flesh. In some instances he would tell people what he thought was the matter with them, and in some few instances he did resort to massage in addition to the touching of the body with his fingers. But the state as well as defense witnesses testified that they did not go to him as a medical doctor or for medical treatment.

The defendant testified that his home was in Columbus, Georgia, where he was a member of the "Missionary Baptist Church," and that he had practiced healing by this God given power since his boyhood, in Columbus and in Geneva, Alabama, before coming to Walton County. He applied for and obtained from the county judge an occupational license. He did not know just what kind of a license it would be but he thought he ought to take out a license. The county judge issued him a license to "engage in the business, profession or occupation of "Gifted Healer" for a period ending October 1, 1941. It is stated on the license that it is issued in accordance with Chapter 18011 of the Acts of 1937. A similar license was again issued to him for a period beginning October 1, 1941 and ending October 1, 1942. He testified that the words "Gifted Healer" were not suggested by him but were placed in the license by the county judge. The section of the statute under which this license was evidently issued is also contained in the Acts of 1941, and now appears as Section 205.41 of the Florida Statutes of 1941 and reads as follows:

"Every fortune teller, clairvoyant, palmist, astrologer, phrenologist, character reader, spirit medium, absent treatment healer, or mental healer, and every person engaged in any occupation of a similar nature shall pay a license tax of one hundred dollars; provided, that this section shall not be

construed to require members of any. recognized christian denomination who pray for the sick to obtain a license."

Upon objection of the State, the court did not permit the introduction of these licenses in evidences. As the question of this appellant's good faith was, to some extent at least, involved in this case, we are of the opinion that these documents should have been admitted.

The above statute does establish as the public policy of the state that no license should be required of a member of any recognized christian denomination who merely prays for the sick.

This is closely allied to the public policy established by Section 456.04, Florida Statutes 1941, being one of the sections of the Florida "basic science law," now appearing as Chapter 456, Florida Statutes of 1941. That statute provides that no person shall be eligible for an examination for a license to practice any branch of the healing art until he has presented to the Licensing Board a certificate of efficiency in the basic sciences as provided in the Act. Section 456.04 exempts from the operation of this Act "Christian Scientists practicing within the limits of their respective calling." It would seem that the spirit of this exemption would likewise apply to others who rely mainly on prayer for the healing of the afflicted. In the case of State v. Bryan, 87 Fla. 56, 99 So. 327, this Court said:

"The organic declaration that 'all men are equal before the law' may be regarded as a guarantee that all persons shall have equal consideration and protection of the law for the maintenance and security of the rights to which they are legally entitled. Noble v. State, 68 Fla. 1, 66 South. Rep. 153.

"The constitutional right of equal protection of the laws means that every one is entitled to stand before the law on equal terms with, to enjoy the same rights as belong to, and to bear the same burdens as are imposed upon, others in a like situation.

"Equal protection of the laws means subjection to equal laws applying alike to all in the same situation. Southern Ry. Co. v. Greene, 216 U. S. 400, 30 Sup. Ct. Rep. 287."

There is much authority to the effect that the practice of healing by Christian Science, or by prayer and faith alone, is not the practice of medicine in the ordinary and popular sense of that term. There are also cases to the contrary. See 41 Am. Jur. 160.

It is held in some cases to be a violation of the statute for an unlicensed person to treat or undertake to heal by the "laying on of hands" coupled with prayer, and in other cases it is held that the laying on of hands coupled with healing by invoking direct Divine Agency by prayer is not within the statute. 48 C. J. 1075.

There is quite an interesting opinion in the case of People v. Cole, 219 N. Y. 98, 113 N.E. 790, L.R.A. 1917C, 816. In that case it was held that Christian Science healing was the practice of a religious tenet within the meaning of a statute forbidding, without license, any one to hold himself out as being able to diagnose or treat any human disease but providing that it shall not affect the practice of any religious tenet of their Church. In this connection we must not overlook Section 5 of our Declaration of Rights, which guarantees the free exercise and enjoyment of religious profession and worship so long as no licentious or subversive practices, inconsistent with the peace and moral safety of the state or society, are engaged in.

We recognize the wisdom and constitutional validity of the legislative policy of protecting the public by penal laws against ignorant quacks and scheming charlatans who would attempt to pose as members of the great medical profession and assume the ability to diagnose diseases and prescribe drugs or perform operations for their cure. The proper practice of medicine and surgery require years of study and training, and the qualifications of those who are allowed to enter this noble profession must be evidenced by licenses issued by the State Board of Medical Examiners, who have endeavored to maintain a high standard of mental and moral qualifications in the profession  The overwhelming majority of our people depend entirely upon the medical profession to diagnose and cure their ills and to restore them to health and vigor and are very skeptical of the merit of any other means.

But the Legislature has also recognized the fact that from ancient times down to this modern and so called materialistic age there have always been quite a large percentage of people who believed in the efficacy and availability of Divine power, not only to save souls but also the bodies and lives of men and to heal all the ills that flesh is heir to, if one but has sufficient faith to invoke the interposition of that Supreme power. And if this class of people hear and believe that some person can and does invoke the power of Most High to heal people of their ills, or that in his own person such individual possesses some strange mental, magnetic or psychic power to banish disease from the human body, people entertaining that belief will seek him out. And it is not the policy of our laws to prevent them; nor to punish those to whom they go, and who endeavor to heal the ills of men by such mental or spiritual means—so long as they do not invade the province of the medical profession and assume the ability to diagnose diseases and prescribe drugs or other medical or surgical or mechanical means to restore the health of those who go to them. The reason for this policy is founded upon the liberty of the individual citizen under our bill of rights, and the fact that so long as these faith healers or spirit mediums rely upon their power, by prayer or faith, to invoke the exercise of the power of the Almighty, if indeed they fail to cure, they at least can do no harm. On the other hand, the ignorant and unlicensed quack who poses as a physician and attempts to diagnose diseases and to prescribe drugs or perform operations, etc., may, and probably will, do a great deal of harm and is dangerous to the community.

We all know that many of our Christian Churches teach and believe that prayer to and faith in the God and Father of us all is efficacious, not only to save us from our sins, but to save us also from our bodily ills. There is much in the Holy Bible which supports this view, but when it comes to bodily ills, a large proportion of the members of our various Christian denominations prefer to call in a good doctor and pray the Lord to guide him and help him to effect a cure. However, they have not the slightest desire to invoke the power of government and penal laws to prevent others, who

are willing to trust exclusively to Divine Power to do the healing work for them, to adopt such course.

Now this appellant testified that the power which he invoked was not his own, but that it was the power of God. And if some of the uncontradicted witnesses are to be believed, he was instrumental in accomplishing some remarkable cures. And there is no evidence to show that he ever did anyone any harm or injury. Now, to most of us, this matter of healing "by faith and the laying on of hands" ancient as it is, is still beyond us. But according to Shakespeare's Hamlet, "There are more things in heaven and earth, Horatio, than are dreamt of in your philosophy." And in that magnificent speech of St. Paul's before King Agrippa, he said to the King: "Why should it be thought a thing incredible with you, that God should raise the dead?" So the Legislature and the courts might well accord our citizens the liberty to decide such questions as these for themselves.

The uneducated and unlettered appellant stated, in reply to a question, that he did not know what the word "tenets" means, nor did he know whether his work was in accord with the tenets or teachings of the Baptist Church. Nor do we. But we do know that one of the greatest preachers of modern times, Dr. Charles H. Spurgeon, pastor of a great Baptist Church in London, believed firmly that the power of prayer, and faith that the Heavenly Father would answer the prayer, could and would heal the sick, and it is said that he himself was credited with being instrumental by these means to bring healing and health to many.

Some such considerations as those above pointed out doubtless induced the Legislature to establish the public policy indicated by the exception clauses contained in the statutes above referred to.

Our conclusion from a study of this record is that the weight and probative effect of the testimony was in favor of the defendant and failed to show that he was practicing medicine within the meaning of our statutes, and that therefore the court erred in denying the motion for a new trial.

BUFORD, C. J., and TERRELL, J., concur.