GROSS, J.
In this Engle[1] progeny case, R. J. Reynolds Tobacco Company appeals from a final judgment entered in favor of the plaintiff below, Pamela Ciccone, as personal representative of the Estate of George N. Ciccone. The final judgment upheld the jury’s award of $3,195,222.35 in compensatory damages, reduced by the deceased’s 70% comparative fault, and $50,000 in punitive damages for gross negligence. We affirm in all respects but one — we reverse the award of punitive damages.
Ciccone initiated her suit against R.J. Reynolds in 2004, two years after her husband, a smoker from the age of eight, died of lung cancer. Following the Engle decision, Ciccone amended her complaint to reflect her membership in the Engle class, alleging that, prior to the cut-off date of November 21, 1996, her husband developed peripheral vascular disease (“PVD”), a smoking-related illness that results in the thinning of arteries and lack of circulation in the extremities. In her fourth amended complaint, Ciccone asserted seven counts: (I) strict liability; (II) breach of express warranty; (III) breach of implied warranty; (IV) civil conspiracy to fraudulently conceal; (V) fraudulent concealment; (VI) gross negligence; and (VII) negligence.

Trial Phase I

Much of the trial’s Phase I centered upon Ciccone’s assertion of Engle class membership, most notably whether the onset of the deceased’s PVD “manifested” prior to November 21,1996. Prior to trial, R.J. Reynolds requested the following definition for “manifested,” which imports the term’s legal definition from case law grap *607 pling with “creeping diseases”[2] and the accrual of a cause of action that triggers the running of the statute of limitations:
For this purpose, “manifested” means either that there was a diagnosis of “PVD” or that the smoker experienced symptoms sufficient to put a reasonable person on notice that there was a potential connection between his symptoms of “PVD” and cigarette smoking.
Over objection, the trial court declined R.J. Reynolds’ request, choosing instead to define “manifestation” as occurring when the deceased either “experienced symptoms of [PVD] or was diagnosed with [PVD] by a physician.” The trial court emphasized that Ciccone could meet this burden only through expert testimony, and could not rely “just in general [on] any symptomology that some layman could take to” be one ailment or another.
Ciccone’s Case as to “Manifestation ”
To establish the deceased’s manifestation of PVD caused by smoking, Ciccone called two expert witnesses: Dr. Michael Hirsch, the deceased’s treating physician, and Dr. Allan Feingold, the deceased’s pul-monologist. Dr. Hirsch characterized the deceased as a “very difficult” and “tough” patient, in that it was “difficult to convince [him] to take advice from physicians.” When the deceased first arrived at the doctor’s office in 1988, Dr. Hirsch described him as “relentless” in his chain smoking, routinely smoking three to four packs of cigarettes per day. By April 6, 1990, Dr. Hirsch diagnosed the deceased as having a nicotine addiction and recommended that he use certain medication and nicotine patches.
On June 27, 1991, the deceased returned to Dr. Hirsch’s office complaining of “chronic back pain,” with such pain radiating down his leg and hip. The doctor performed an MRI scan and an x-ray of the deceased’s lumbar spine. The scan showed, among other things, the existence of spondylosis and vascular sclerosis, common signs of early stage PVD. Nevertheless, Dr. Hirsch testified that “nothing was done about it” because the deceased “wasn’t having any symptoms ... at the time” since the disease “takes a long time to develop,” particularly where it attacked the aortic area, as it did in the deceased.
From 1991 through 1998, the deceased managed to avoid doctors and his condition continued to worsen. A co-worker of the deceased from 1994 through 1995 testified that the deceased had trouble using ladders and walked with a noticeable limp, persistently favoring his right side. Due to such problems, when carpooling, the deceased would request the co-worker to drop him off close to their place of employment so he would not have to walk a great distance. Likewise, the deceased’s stepson testified that by the time of the stepson’s 1995 wedding, the deceased’s leg issues had worsened to the point that he had difficulty getting up stairs and could not even dance with the bride.
In 1998, the deceased reported the problems to his doctors, at which point he was sent to a neurosurgeon to address his back problems. From there, he also went to a vascular surgeon to address his “claudication problems,” which Dr. Hirsch described as “pain that occurs ... with exertion that’s due to [PVD,] narrowing of the artery, [and] lack of blood flow to the area.” By 1999, the deceased was finally *608 diagnosed as having PVD; to address the disease, he then had bypass surgery, which cleared up much of the symptoms that had manifested in his leg.
Dr. Feingold corroborated much of Dr. Hirsch’s observations, testifying that the deceased’s first manifestation of PVD was evidenced by the 1991 lumbar spine x-ray, even though this only showed a “soft” condition. Thereafter, Dr. Feingold opined that by 1994 through 1995, the pain the deceased experienced in his right leg while walking, as described by the co-worker and stepson, was consistent with symptoms of intermittent claudication caused by PVD.
Additionally, Dr. Feingold testified that by the time the deceased finally had bypass surgery in 1999, his PVD had reached a “serious” state of late stage development, evidenced by the fact that he was exhibiting no blood flow below the inguinal zone. This level of “seriousness,” in Dr. Fein-gold’s opinion, was extremely important to pinpointing when the “manifestation” of the disease occurred, since such a level of PVD takes “at least more than five years” to develop. Although Dr. Feingold later admitted on cross examination that the deceased never exhibited the classic first signs of PVD, he opined that the deceased’s back injuries made subsequent symptoms appear “misleading.”

The Defense’s Case

R.J. Reynolds called Dr. David Charles Brewster, a vascular surgeon, who opined that the deceased’s PVD symptoms first arose in early 1998. To support his opinion, Dr. Brewster described PVD as “a thickening deposit on the wall of the artery, which, if it progressively worsens, will begin to narrow the artery.” In conjunction with this definition, Dr. Brewster explained that the earliest sign of PVD is a claudication, which takes effect only when one is either walking or exercising. Thereafter, once the PVD gets worse, the patient will lose his pulse along with the hair on his extremity.
As applied to this case, Dr. Brewster stated that the deceased was not suffering from PVD prior to 1998, since, during that time, the pain he felt was present both when he walked and while he was at rest. Dr. Brewster bolstered his opinion by observing that the deceased failed to show many of the telltale signs of PVD, such as loss of hair on his extremity, short or thin appearance of the skin, or loss of pulse in the ankle. As a result, Dr. Brewster opined that the pain the deceased felt in his leg during this time was attributable to his back problems, particularly a ruptured disk and nerve root compression.

Trial Motions and Jury Verdict

After the close of Phase I, R.J. Reynolds moved for a directed verdict on the grounds that Ciccone failed to present sufficient evidence to establish her membership in the Engle class. The trial court decided to submit the fact question of class membership to the jury. Following deliberations, the jury found, among other things, Ciccone to be an Engle class member.

Trial Phase II and Verdict

In Phase II, the jury was tasked with deciding whether R.J. Reynolds was liable under Ciccone’s compensatory damages claims, and whether Ciccone was entitled to punitive damages. The jury found in favor of Ciccone on her claims of negligence, strict liability, and gross negligence; the jury, however, rejected her claims under concealment and conspiracy. As to compensatory damages, the jury awarded Ciccone $195,222.35 in medical and funeral expenses along with $3,000,000 in non-economic compensatory damages, to be reduced by the deceased’s 70% comparative fault. In addition, the jury awarded Cic- *609 cone $50,000 in punitive damages for her claim of gross negligence.
The Trial Court Correctly Charged the Jury Regarding the “Manifestation” of the Deceased’s PVD for the Purpose of Determining Ciccone’s Membership in the Engle Class
R.J. Reynolds contends that the trial court twice erred in handling the issue of Ciccone’s class membership. First, R.J. Reynolds argues that the trial court abused its discretion by erroneously instructing the jury that the deceased’s manifestation of PVD occurred when he had “symptoms” of the disease, instead of when the deceased was on notice of the causal connection between his smoking and his PVD. Second, R.J. Reynolds argues that the trial court erred as a matter of law by failing to grant a directed verdict in the defense’s favor since Ciccone failed to present any competent evidence that the deceased’s PVD manifested prior to November 21,1996.
The correctness of the trial court’s charge to the jury regarding class membership turns on the proper definition of “manifestation.” R.J. Reynolds contends that the term “manifestation” has “a well-established meaning in Florida case law, under which the plaintiff must be on notice of both the condition and the causal connection between the condition and the product at issue.” In response, Ciccone argues that such definition, which developed for the purposes of determining when the statute of limitations should begin to run in “creeping disease” cases, is guided by separate policy that is inapplicable to this case.
“In formulating jury instructions, the trial court is accorded broad discretion, and ‘its decision should not be reversed unless the error complained of resulted in a miscarriage of justice or the jury instructions were reasonably calculated to confuse or mislead the jury.’ ” Belle Glade Chevrolet-Cadillac Buick Pontiac Oldsmobile, Inc. v. Figgie, 54 So.3d 991, 997 (Fla. 4th DCA 2010) (quoting Chevron U.S.A., Inc. v. Forbes, 783 So.2d 1215, 1218 (Fla. 4th DCA 2001)). “The party defending the instructions on appeal must show that the requested instructions accurately stated the applicable law, the facts supported giving the instruction, and that the instruction was necessary in order to allow the jury to properly resolve all the issues in the case.” Barton Protective Servs., Inc. v. Faber, 745 So.2d 968, 974 (Fla. 4th DCA 1999). “If the jury instructions, as a whole, fairly state the applicable law to the jury, the failure to give a particular instruction will not be an error.” Id. (citing CSX Transp., Inc. v. Whittier, 584 So.2d 579 (Fla. 5th DCA 1991)).
The centrality of the term “manifest” in deciding the class membership issue in this appeal derives from the Supreme Court’s use of the term in Engle. 945 So.2d at 1274-76.
On November 21, 1996, the trial court in Engle recertified the class there at issue to include the approximately 700,000 Florida “ ‘citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.’” Id. at 1256, 1258, 1275. The Florida Supreme Court vacated the punitive damages award and decertified the class to allow each Engle class member the opportunity to file an individual suit to determine his or her entitlement to compensatory and punitive damages. Id. at 1264-65, 1268, 1276-77. In so doing, however, the Supreme Court did not decertify the class in the traditional sense, but conferred upon the class members two benefits: (1) each class member’s time to file an individual suit would be equitably tolled to allow filing *610 within one year of the court’s decision, and (2) in the individual action, the Engle jury’s “common core findings” in Phase I would be given “res judicata effect.” Id. at 1269.
In shaping the contours of class membership, the Supreme Court was careful to craft a “finite class” in “that the class would be cut off or limited to the date of final certification.” Id. at 1275. The Court observed that the reason a “finite class” was necessary was “to avoid multiple similar lawsuits and to make legal process more effective and expeditious, important goals of a class action suit.” Id. To define the scope of the class, the Court wrote that “the class should include only those people who were affected in the past or who were presently suffering at the time the class was recertified by the trial court” on November 21, 1996. Id. The Court emphasized that diagnosis by a physician prior to this date was not a requirement for class membership; rather, “[t]he critical event is ... when the disease or condition first manifested itself.” Id. at 1276 (emphasis added).
To give meaning to the Supreme Court’s use of the term “manifested itself’ in En-gle, R.J. Reynolds relies upon Castleman v. R.J. Reynolds Tobacco Co., a case which holds that a condition “manifests” itself as a tobacco-related illness for the purpose of Engle class membership only when the potential plaintiff “knew, or reasonably should have known, enough to permit her to commence a non-frivolous tort lawsuit” against the tobacco company. 97 So.3d 875, 877 (Fla. 1st DCA 2012) (citation and internal quotations omitted). To arrive at this holding, the first district relied upon a line of cases that concern the accrual of a cause of action for statute of limitations purposes. See, e.g., Frazier v. Philip Morris USA Inc., 89 So.3d 937 (Fla. 3d DCA 2012). In the Supreme Court’s use of the term “manifested itself’ in Engle, however, we do not detect an intention to import a definition from the “creeping disease” statute of limitations cases. To paraphrase Justice Cardozo, legal terms of art “are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it.” Berkey v. Third Ave. Ry. Co., 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926).
Resolution of this matter involves the interplay between legal terminology and the policy that drives it. For the statute of limitations cases, one aspect of the policy is obvious — a plaintiff should not be required to file a cause of action before he should have realized he had one. That concern is not applicable to the issue of Engle class membership.
In products liability cases, the four-year statute of limitations period begins to run “from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence.” § 95.031(2)(b), Fla. Stat. (2011); § 95.11(3)(a), Fla. Stat. (2011). While this starting point is often easy to pinpoint in some cases, see, e.g., Steiner v. Ciba-Geigy Corp., 364 So.2d 47, 49 (Fla. 3d DCA 1978) (plaintiff developed blindness after ingesting faulty medication), such is not the case with “creeping diseases,” where the connection between a plaintiffs initial' symptoms and a defendant’s conduct can remain unknown until reaching a later stage of worsened development. See, e.g., Barnes v. Clark Sand Co., 721 So.2d 329, 330 (Fla. 1st DCA 1998) (plaintiff did not know that his lung problems were attributable to silica dust exposure until 1992, despite having been exposed to such dust from 1972 to 1974 and having a lung removed in 1984); see also Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932, 936-37 (Fla.2000) (defining a “creeping disease” as “a disease acquired over a period of years as a *611 result of long-term exposure to injurious substances”) (citing Copeland v. Armstrong Cork Co., 447 So.2d 922, 926 (Fla. 3d DCA 1984), quashed in part by Celotex Corp. v. Copeland, 471 So.2d 533 (Fla.1985)).
Given the imprecise nature of isolating when the relationship between a “creeping disease” and a deleterious substance becomes evident, and the resulting difficulty this places upon the accrual of a statute of limitations, the Supreme Court, in Carter, imbued the term “manifest” with a notice requirement to a potential plaintiff, such that “the cause of action accrues when the accumulated effects of the deleterious substance manifest themselves to the claimant in a way which supplies some evidence of a causal relationship to the manufactured product.” 778 So.2d at 934, 937 (Fla.2000). The policy behind creating such a definition in these situations reflects common sense: since one purpose of a statute of limitations is to spur a plaintiff into acting, it is both illogical and unfair for the statute to begin to run before the plaintiff knows or should have known of the causal connection that is the basis for his suit.
In forming this decision, the Carter court resolved a conflict between Celotex Corp. v. Copeland, 471 So.2d 533 (Fla.1985), and the first district’s decision in Brown & Williamson Tobacco Corp. v. Carter, 723 So.2d 833 (Fla. 1st DCA 1998), both of which illustrate that the rule in Carter is largely based on concerns of fairness to the plaintiff.
In Celotex Corp., the plaintiff initiated a products liability suit in 1979 against asbestos manufacturers after learning of the connection between his illness and his exposure to asbestos over a thirty-three-year period. 471 So.2d at 534. Although the plaintiff first became aware of the health hazards associated with asbestos in 1958 or 1959, “he did not suffer any physical problems until the later 1960’s.” Id. By 1972, the plaintiff was diagnosed with having pneumonia and emphysema, although neither was attributable to his work. Thereafter, in 1978, he was finally diagnosed with asbestosis. Id. at 534-35; Carter, 778 So.2d at 935.
The trial court in Celotex Corp. found the plaintiffs case to be barred by the statute of limitations since he should have known of the causal connection between his exposure and his ailments in 1972 when he began coughing up blood. Carter, 778 So.2d at 936. The Supreme Court, however, disagreed, finding that the doctors’ disclosure to the plaintiff that his emphysema and pneumonia were “unrelated to the job ... could lead a reasonable person to conclude ... that the condition was not related to the asbestos dust at all.” Id. (quoting Copeland v. Armstrong Cork Co., 447 So.2d 922, 928 (Fla. 3d DCA 1984)).
Concerns about fairness to the plaintiff similarly drove the result in Brown & Williamson. There, the plaintiff, a long-time smoker, began coughing up blood in late January 1991. 723 So.2d at 835. Alarmed, the plaintiff immediately scheduled an appointment with his doctor for February 4, at which point x-rays taken of his chest showed “a spot or abnormality on the lung which could indicate several things, including cancer or tuberculosis.” Id. The next day, the plaintiff met with a pulmonologist who told him that the x-rays were “highly suggestive” of a lung tumor, but stopped short of diagnosing the spot as such since “many different things can mimic other things on the chest x-ray.” Id. A week later, on February 12, the plaintiff was diagnosed as having lung cancer. Id.
On February 10, 1995, over four years after the February 4, 1991 x-rays were taken, but before the statute of limitations ran on the February 12, 1991 diagnosis of *612 lung cancer, the plaintiff filed suit against the tobacco industry to recover for his illness. Id. at 834. The first district found the suit to be barred by the four-year statute of limitations since the plaintiff either “knew or should have known, before February 10, 1991, that his lungs were injured, and he was on notice that the injury was probably caused by smoking.” Id. at 836 (emphasis added). The Supreme Court quashed the first district’s opinion, finding that the running of the statute of limitations was a fact issue for the jury to resolve; since the plaintiffs doctor provided him with “at least two possible explanations for the spot, one of which was tuberculosis ..., a reasonable person could conclude that the spot was not related to smoking or cancer.” Carter, 778 So.2d at 938.
As these cases illustrate, in the context of “creeping diseases,” the requirement of knowledge of the causal connection between the infirmity and the product is grounded in balancing fairness to the plaintiff with the policy driving the statute of limitations. The primary purpose of a statute of limitations is to compel the exercise of a right of action within a reasonable time “to protect defendants from unfair surprise and stale claims.” Major League Baseball v. Morsani, 790 So.2d 1071, 1074-75 (Fla.2001); see 35 Fla. Jur.2d, Limitations and Laches § 1 (2013). If courts were to find that “creeping diseases” “manifest” at first sign of “symptoms,” such policy would be disserved, as the statute of limitations would bar plaintiffs from pursuing fruitful causes of action before the plaintiff even knows enough “to commence a non-frivolous tort lawsuit.” Frazier, 89 So.3d at 946.
In Castleman, the first district borrowed a definition of “manifestation” from the creeping disease statute of limitations cases to bar a plaintiff from claiming Engle class membership in a near-identical situation to the case at hand. 97 So.3d at 877. There, the plaintiff smoker began experiencing shortness of breath, bouts of coughing, and chest pain from the early 1990’s through 1993. Id. at 876. Despite these symptoms, neither the plaintiff “nor any of his medical care providers attributed his health issues to his prior history of smoking until 1998, when [the plaintiff] underwent heart bypass surgery.” Id. That same year, the plaintiffs “medical care providers advised him for the first time that the symptoms he was experiencing ... were likely smoking-related.” Id.
With this factual setting, the Castleman trial court found the plaintiff’s claim to be barred since the plaintiffs illness “manifested” after November 21, 1996, the date identified in Engle as the “cut-off date for class membership.” Id. at 877; Engle, 945 So.2d at 1275. In affirming, the first district looked to the language of the Engle decision, which states that “[t]he critical event” in determining class membership “is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself.” Engle, 945 So.2d at 1276 (emphasis added); Castleman, 97 So.3d at 877. Then, applying the definition of “manifestation” from the statute of limitations cases, the court found the plaintiffs class membership was barred since he “did not attribute his illnesses to his history of smoking until 1998, [and] he was not aware of sufficient facts to permit the filing of a non-frivolous tort lawsuit against the tobacco company before 1998.” Castleman, 97 So.3d at 877; see also Rearick v. R.J. Reynolds Tobacco Co., 68 So.3d 944, 945 (Fla. 3d DCA 2011) (“The qualification for membership in the Engle class requires plaintiff to show that the decedent was a resident of the state of Florida at the time of a ‘medical diagnosis’ of a smoking-related disease or at the time evidence of the causal relationship of the *613 cause of action had [otherwise] manifested itself.”).
Castleman fails to take into account the differences in policy between the accrual of a cause of action for the purpose of the statute of limitations and pinpointing a date for class membership by looking back in time from the 2006 Engle decision.
“The purpose of the class action is to provide litigants who share common questions of law and fact with an economically viable means of addressing their needs in court.” Johnson v. Plantation Gen. Hosp. Ltd. P’ship, 641 So.2d 58, 60 (Fla.1994). It “contemplates a single judgment,” Galen of Fla., Inc. v. Arscott, 629 So.2d 856, 857 (Fla. 5th DCA 1993), and serves to consolidate and bind all class members to the judgment of the class. Under Florida Rule of Civil Procedure 1.220(a), plaintiffs seeking to initiate a class action lawsuit must satisfy four prerequisites:
that (1) the members of the class are so numerous that separate joinder of each member is impracticable, (2) the claim or defense of the representative party raises questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class, (3) the claim or defense of the representative party is typical of the claim or defense of each member of the class, and (4) the representative party can fairly and adequately protect and represent the interests of each member of the class.
Once these prerequisites are met and the class is found to be maintainable, the party asserting the existence of the class must then provide “notice of the pendency of the claim or defense ... to all the members of the class ... who can be identified and located through reasonable effort.” Fla. R. Civ. P. 1.220(d)(2). Following the passing of the opt-out period, the class “judgment, whether favorable or not, will include all members who do not request exclusion.” Fla. R. Civ. P. 1.220(d)(2)(B).
Class actions typically do not require a class member, during a class membership period, to realize that he has a cause of action; “[c]lass actions typically expand the universe of participating class members beyond known individuals after certification has been granted,” since that is when “many putative class members [first] learn about (or decide to pay attention to) the litigation that is proceeding on their behalf.” Kerner v. City & Cnty of Denver, No. 11-cv-00256-MSK-KMT, 2013 WL 1222394, at *2 (D.Colo. Mar.25, 2013).
In conformity with Rule 1.220, our supreme court clarified that the Engle class, as certified, consists of all Florida “‘citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.’ ” Engle, 945 So.2d at 1256. To curtail the class from becoming open-ended, the court incorporated a November 21, 1996 cut-off date, such that “the class would be cut off or limited to the date of final certification.” Id. at 1275. This deadline was not, however, tied to the plaintiffs knowledge; rather, all a plaintiff had to show was that he or she was included among “those people who were affected in the past or who were presently suffering at the time the class was recertified by the trial court.” Id.
Thus, as shaped by the Supreme Court under the unique circumstances of Engle, the question of class membership is a fact issue viewed with the benefit of hindsight from the vantage point of 2006, where expert testimony may establish the link between a plaintiffs concrete symptoms and tobacco; class membership is not *614 an inquiry into the abstraction of what a plaintiff knew or should have known over ten years earlier. The unfairness to a plaintiff that informs the knowledge requirement of the statute of limitations cases is absent in this scenario. The term “manifested” as used in Engle has a narrower definition than that given to it in Castleman. As the plaintiff argues in her brief, the Supreme Court’s use of the term “manifested” in Engle signifies an “event that is neither dependent on the skill of the [treating] physician nor the sophistication of the patient — it is enough that the decedent have suffered a medical condition that first” became symptomatic before November 21,1996.
Neither Rule 1.220 nor the language of Engle imposes upon potential class members the limitation that they knew enough to commence a non-frivolous tort lawsuit on or before November 21, 1996. Rather, the requirements for class membership are (1) that the plaintiff was a Florida resident, (2) that he or she either suffered or was suffering from a smoking related illness before November 21, 1996, and (3) that his or her addiction to nicotine caused the disease. See Lorillard Tobacco Co. v. Mrozek, 106 So.3d 479, 481 (Fla. 1st DCA 2012) (“The [Engle ] class definition requires only that the smoker is/was addicted to cigarettes containing nicotine, and contracted or died from a disease caused by cigarette smoking.”); Bishop ex rel. Estate of Ramsay v. R.J. Reynolds Tobacco Co., 96 So.3d 464, 468 (Fla. 5th DCA 2012) (“[Inclusion in the Engle class requires Florida residence or citizenship when the disease or condition first manifests itself, not at the time of death.”); R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060, 1065 (Fla. 1st DCA 2010) (“In order to be a member of the Engle class, the plaintiff must prove that [the deceased] was addicted to R.J. Reynolds cigarettes containing nicotine, and, if so, that his addiction was the legal cause of his death.”); Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324, 1328 n. 3 (11th Cir.2010); Philip Morris USA Inc. v. Allen, 116 So.3d 467, 2013 WL 1923636, at *3 & n. 4 (Fla. 1st DCA 2013) (holding that, to establish class membership, the plaintiff must establish “the fact that the addiction caused the disease”); Philip Morris USA, Inc. v. Hess, 95 So.3d 254, 258 (Fla. 4th DCA 2012) (“To find that [the plaintiff] was a member of the Engle class, the jury was required to find that his addiction to cigarettes containing nicotine was a legal cause of his death.”).
In reaching this conclusion, we are guided by the Supreme Court’s treatment of one of the Engle class representatives, Angie Della Vecchia. Although Della Vecchia remained undiagnosed with lung cancer until 1997, the Engle court found her class membership to be sufficiently proven since, much like the plaintiff in the case at hand, “it was noted by her doctors in early 1997 that she had a past medical history of ‘COPD’ and significant hypertension.” 945 So.2d at 1276. Notably, the court made no remarks as to Della Vecchia’s knowledge of her disease; all that was required was that her “medical records indicatefd] that she had been suffering from a tobacco-related disease prior to the time of certification.” Id.

The Adequacy of the Trial Court’s Instruction

Assuming that the plaintiff’s pre-1996 knowledge of a causal link between symptoms and tobacco is unnecessary for class membership, the next question is whether the trial court erred in instructing the jury that the deceased’s PVD “manifested” when he developed “symptoms.” “Trial courts are generally accorded broad discretion in formulating jury instructions,” Barbour v. Brinker Fla., Inc., 801 So.2d *615 958, 959 (Fla. 5th DCA 2001), and such decision “should not be disturbed on appeal absent prejudicial error.” Rucker v. Garlock, Inc., 672 So.2d 100, 101 (Fla. 3d DCA 1996). “In order for a jury instruction to result in a miscarriage of justice, it must not only be erroneous or an incomplete statement of the law but also be confusing or misleading.” Costa v. Aberle, 96 So.3d 959, 963 (Fla. 4th DCA 2012) (citing Gross v. Lyons, 721 So.2d 304, 306 (Fla. 4th DCA 1998)).
As stated above, the key point in determining Engle class membership is pinpointing when the plaintiff began “suffering” from the smoking-related illness or when the illness “manifested.” Engle 945 So.2d at 1275. Rather than the statute of limitations cases, the preferable definition here for “manifested” is derived from insurance coverage cases. In Preferred Risk Life Insurance Co. v. Sande, 421 So.2d 566 (Fla. 5th DCA 1982), the fifth district faced a situation where symptoms were readily apparent yet remained undiagnosed. Although the court noted that “the Florida courts have never specifically defined what ‘manifested’ means,” it nonetheless found that “the accepted definition seems to center around the symptoms”:
That point in time when the sickness or disease becomes symptomatic and not necessarily when the exact nature of sickness or disease is diagnosed by a physician after extensive testing.
Id. at 568 (quoting McDaniel v. State Farm Mut. Ins. Co., 3 Kan.App.2d 174, 591 P.2d 1094 (1979)); see also Am. Sun Life Ins. Co. v. Remig, 482 So.2d 435, 436 (Fla. 5th DCA 1985) (“A condition, not otherwise diagnosed, is manifest when the insured knew or should have known of the existence of his illness because he was experiencing symptoms that would lead a reasonable person to seek a medical diagnosis.”).
Such reasoning appears to fall in line with the common notion that a disease “manifests” when it becomes diagnosable through evaluation of the patient’s “symptoms.” Cf. Curley v. State, 153 Fla. 773, 16 So.2d 440 (1943) (en banc) (defining diagnose as: “To ascertain by diagnosis [or] to recognize by its symptoms [ ] as a disease”); Black’s Law Dictionary 484 (8th ed. 2004) (defining “diagnosis” as “[t]he determination of a medical condition (such as a disease) by physical examination or by study of its symptoms.” (emphasis added)). Neither party disputes that PVD is caused by smoking. Since exhibiting “symptoms” of PVD creates the implication that the deceased was “suffering” from PVD, it follows that such a showing would be sufficient for the purposes of class membership. The issue was a question of fact for the jury to be decided with the assistance of expert testimony. The trial court’s instruction was neither erroneous nor incomplete.

Directed Verdict

R.J. Reynolds next contends that the trial court committed reversible error in denying its motion for directed verdict since Ciccone “fail[ed] to introduce any reliable medical evidence demonstrating that [the deceased] experienced symptoms of PVD prior to the class membership cutoff date” of November 21, 1996. Since directed verdicts involve a question of law, our review of this matter is de novo. See Aragon v. Issa, 103 So.3d 887, 888 (Fla. 4th DCA 2012).
“A motion for directed verdict is available during a trial to test the legal sufficiency of the evidence.” Moisan v. Frank K. Kriz, Jr., M.D., P.A., 531 So.2d 398, 399 (Fla. 2d DCA 1988) (citing Tiny’s Liquors, Inc. v. Davis, 353 So.2d 168 (Fla. 3d DCA 1977)). Given the severity in granting such relief, see Custer Med. Ctr. v. United Auto. Ins. Co., 62 So.3d 1086, *616 1090 (Fla.2010), motions for directed verdict should be cautiously reserved for situations where “the court, after viewing the evidence and testimony in the light most favorable to the nonmoving party, determines that no reasonable jury could render a verdict for the nonmoving party.” Miller v. City of Jacksonville, 603 So.2d 1310, 1311-12 (Fla. 1st DCA 1992) (emphasis added).
In this case, to establish when the deceased began “suffering” from PVD, Ciccone presented the testimony of two expert witnesses who agreed that the first indication of the deceased’s PVD arose in 1991, when his lumbar spine MRI showed aortic sclerosis, a common early sign of PVD. With his back problems still bothering him, the deceased managed to evade doctors until 1998, during which period he sought to “self medicate” through chiropractors. However, a year after he returned in 1998, his examining doctors were finally able to determine that the pain the deceased was experiencing was not solely attributable to his back, but it also stemmed from a severe form of PVD which had manifested in his body for years. Any remaining suspicions as to the “seriousness” of the deceased’s PVD, if they remained, were later verified when bypass surgery immediately cleared up much of the pain he had been experiencing in his leg. In addition to the expert testimony, the deceased’s friends and family were able to paint a picture of the ragged effect the earlier-stage PVD had on his life.
Although witnesses for the defense testified that these symptoms were attributable to the deceased’s back problems, and were not classic first signs of PVD, the jury was not required to accept this testimony, particularly where contrary evidence existed. See Wald v. Grainger, 64 So.3d 1201, 1204 (Fla.2011) (“[A] jury is free to weigh the credibility of expert witnesses as it does any other witness and to reject any testimony. ...”). Accordingly, the motion for directed verdict was properly denied.

The Trial Court Erred by Permitting the Jury to Award Punitive Damages on the Non-Intentional Tort Claim of Gross Negligence.

We agree with R.J. Reynolds that the trial court erred in allowing Ciccone to recover punitive damages under the theory of gross negligence since that cause of action was not pled in the original Engle class case and the jury found for the defense on the concealment and conspiracy claims. We concur with the analysis of the first district in Soffer v. R.J. Reynolds Tobacco Co., 106 So.3d 456, 460 (Fla. 1st DCA 2012), which held that Engle progeny plaintiffs may recover punitive damages only on claims for concealment or conspiracy. Sojfer accorded some credence to the exceptional nature of the Engle class, as it is “one of the most uniquely structured and extraordinarily adjudicated cases in the state’s history.” Id. Upon this backing, the first district upheld the disallowance of an Engle plaintiffs claim for punitive damages under negligence and strict liability, reasoning that Engle progeny plaintiffs, by virtue of “wearing] the same shoes ... as the plaintiffs in Englej,] ... must accept the status and procedural posture of the Engle litigation as they find it,” including “the absence of a timely claim for punitive damages under negligence.” Id. The court explained:
As members of the class, Engle progeny plaintiffs are in the same position they would have been in had they filed a complaint identical to the Engle class-action complaint on the same date the original complaint was filed. Here, [the plaintiff] is not merely seeking to take advantage of Engle via the filing of a new and independent claim; rather, she *617 was a party to Engle and, to the extent her claims differ from those in that case, she must meet the requirements for amending her complaint, which she cannot do. There is no indication in Engle that our supreme court intended to extend its decision beyond the claims and remedies that had actually been timely asserted in the first place. Punitive damage claims under negligence and strict liability theories were untimely and not authorized as part of the Engle litigation; they were authorized only for the two intentional tort counts of fraud by concealment and conspiracy to commit fraud. If the supreme court had intended that its decision be so open-ended as to allow claims for punitive damages not otherwise made available in the course of Engle, it would have said so....
Id.; see also Hromyak v. Tyco Int’l Ltd., 942 So.2d 1022, 1023 (Fla. 4th DCA 2006) (holding, in a class action case similar to this one, that equitable tolling of the statute of limitations “requires that the claims in the later action be the same as those alleged in the earlier action” (emphasis added)).
The Soffer reasoning is persuasive. The Engle class pled for punitive damages only on its intentional tort claims. Engle was not a run-of-the-mill case involving the de-certification of a class prior to resolution on the merits; rather, the class was previously certified, and its class members who did not opt out accepted the pleadings of its class representatives before the case proceeded through the rigors of litigation. By virtue of going through the litigation process, unlike other decertification cases, Engle progeny plaintiffs were conferred benefits beyond mere equitable tolling, including the significant “res judicata effect” of the Engle jury’s Phase I findings on liability. If the progeny plaintiffs wish to accept such enormous benefits, it makes sense that they must also take the “bitter with the sweet,” since permitting otherwise would allow the plaintiffs to take advantage where the class representatives, and the class as a whole, otherwise would not.
We have considered the remaining issues raised and hold that the trial court did not abuse its discretion in the matters related to selection of the jury and conclude that the remaining issue was resolved by Philip Morris USA, Inc. v. Douglas, 110 So.3d 419, 435 (Fla.2013).
We affirm the final judgment in all respects but one and remand to the trial court for the entry of a final judgment that eliminates the award of punitive damages.
We certify conflict with Castleman v. R.J. Reynolds Tobacco Co., 97 So.3d 875 (Fla. 1st DCA 2012).
MAY, J„ and JOHNSON, LAURA, Associate Judge, concur.

. Engle v. Liggett Group, Inc., 945 So.2d 1246 (Fla.2006).

. A “creeping disease” is "a disease acquired over a period of years as a result of long-term exposure to injurious substances.” Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932, 936-37 (Fla.2000) (citing Copeland v. Armstrong Cork Co., 447 So.2d 922, 926 (Fla. 3d DCA 1984)).