# Supreme Court of Florida

_____

No. SC13-2415
_____

**R.J. REYNOLDS TOBACCO COMPANY,**
Petitioner,

vs.

**PAMELA CICCONE, etc.,**
Respondent.

[March 24, 2016]

PARIENTE, J.

The certified conflict issue in this case requires us to define the term

"manifestation" as it applies to the plaintiff's tobacco-related disease or medical

condition for purposes of establishing membership in the Engle class based on our

decision in Engle v. Liggett Group, Inc., 945 So. 2d 1246 (Fla. 2006).[1]  The

resolution of this narrow issue ultimately turns on our interpretation of this Court's

prior decision in Engle.

_____

    1.  We have jurisdiction.  See art. V, § 3(b)(4), Fla. Const.

In Engle, this Court stated that the "cut-off date" for class membership was November 21, 1996—the date the trial court recertified the class—and described the class as those "who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." Id. at 1275-76 (emphasis omitted) (quoting R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39, 40 (Fla. 3d DCA 1996)). The "critical event" in establishing membership in the Engle class, this Court held, "is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself." Id. at 1276 (second emphasis added).

Applying this Court's Engle decision, the Fourth District Court of Appeal concluded in R.J. Reynolds Tobacco Co. v. Ciccone, 123 So. 3d 604, 615 (Fla. 4th DCA 2013), that the "key point in determining Engle class membership is pinpointing when the plaintiff began 'suffering' from the smoking-related illness or when the illness 'manifested.' " Under this definition of "manifestation," the "plaintiff's pre-1996 knowledge of a causal link between symptoms and tobacco is unnecessary for class membership." Id. at 614.

The First District Court of Appeal reached a contrary conclusion in Castleman v. R.J. Reynolds Tobacco Co., 97 So. 3d 875 (Fla. 1st DCA 2012). Relying on inapplicable precedent from the statute of limitations context, the First District defined "manifestation" for purposes of Engle class membership as the

point at which the plaintiff knew or reasonably should have known of the causal connection between tobacco and the plaintiff's illness to permit the filing of a nonfrivolous tort lawsuit. Castleman, 97 So. 3d at 877.

We resolve this conflict by concluding that "manifestation" for purposes of establishing membership in the Engle class means the point at which the plaintiff began suffering from or experiencing symptoms of a tobacco-related disease or medical condition. Under the definition we adopt, the plaintiff does not need to have been formally diagnosed or know that the symptoms were tobacco-related prior to the "cut-off date" for class membership. Accordingly, we approve the Fourth District's definition of "manifestation" in Ciccone and disapprove the definition applied by the First District in Castleman.[2]

Our holding does not, as the dissent asserts, subject the Engle class to the type of open-endedness this Court specifically avoided in the Engle decision itself. See dissenting op. at 38. If not for this Court's limitations on the scope of the class, the "final class description could lead one to believe that the class is open-

---

2. We quash the portion of the Fourth District's decision regarding punitive damages based on our opinion in Soffer v. R.J. Reynolds Tobacco Co., No. SC13-139, 2016 WL 1065605 (Fla. Mar. 17, 2016) (holding individual members of the Engle class are not prevented from seeking punitive damages on all claims properly raised in their subsequent individual actions following this Court's decertification of the class action in Engle).

ended because there is no stated cut-off date for membership." Engle, 945 So. 2d at 1274.

In Engle, we defined the cut-off date to specifically avoid that result and a potential unfairness to the tobacco companies. Here, we interpret that definition in light of the unique posture of the litigation, in order to avoid unfairness to either the plaintiffs or the tobacco companies. Numerous limitations on the scope of the class still exist—the statute of limitations, the one-year time bar from the time of the mandate in this Court's 2006 decision for filing an individual action, Florida residency, and the requirement that the smoker "have suffered" or be "presently suffering" from a tobacco-related disease or medical condition as of the cut-off date. See id. at 1275-77.

**FACTS AND BACKGROUND**

This case involves a lawsuit filed in 2004 against R.J. Reynolds Tobacco Company, by plaintiff Pamela Ciccone, as the personal representative of the estate of her deceased husband, George Ciccone, a smoker from the age of eight who died of lung cancer in 2002. After our Engle decision was issued, Ciccone amended her complaint "to reflect her membership in the Engle class, alleging that, prior to the cut-off date [for class membership] of November 21, 1996, her husband developed peripheral vascular disease ("PVD"), a smoking-related illness that results in the thinning of arteries and lack of circulation in the extremities."

- 4 -

<u>Ciccone</u>, 123 So. 3d at 606.  As a result of her husband's tobacco-related illness, Ciccone ultimately asserted, in her fourth amended complaint, seven counts against defendant R.J. Reynolds: (1) strict liability; (2) breach of express warranty; (3) breach of implied warranty; (4) civil conspiracy to fraudulently conceal; (5) fraudulent concealment; (6) gross negligence; and (7) negligence.  <u>Id.</u>

According to the framework for tobacco litigation established in <u>Engle</u>, Ciccone's case proceeded to a "Phase I" trial, in which, if she established <u>Engle</u> class membership, she would receive the benefit of res judicata effect of the <u>Engle</u> jury's "common core findings" regarding the issues of liability and general causation.  <u>See</u> <u>Engle</u>, 945 So. 2d at 1255, 1269.  "Much of the trial's Phase I centered upon Ciccone's assertion of <u>Engle</u> class membership, most notably whether the onset of the deceased's PVD 'manifested' prior to November 21, 1996."  <u>Ciccone</u>, 123 So. 3d at 606.

As to the definition of "manifestation," R.J. Reynolds initially requested that the jury be instructed as follows:

> The first issue for your determination is whether the decedent George Ciccone had peripheral vascular disease (PVD) that first manifested itself on or before November 21, 1996.
> For this purpose, "manifested" means either that there was a diagnosis of "PVD" or that the smoker experienced symptoms <u>sufficient to put a reasonable person on notice that there was a potential connection between his symptoms of "PVD" and cigarette smoking</u>.

(Emphasis added.)

Then, in the amended proposed jury instructions, R.J. Reynolds requested the following similar instruction as to "manifestation" of the tobacco-related illness:

> Plaintiff must also prove by the greater weight of the evidence that Mr. Ciccone's peripheral vascular disease or "PVD" manifested prior to November 21, 1996.
> "Manifested" means either there was a diagnosis of "PVD" or there were symptoms of "PVD" that would <u>put a reasonable person on notice that there was a connection between the "PVD" and cigarette smoking</u>.

(Emphasis added.)

The trial court declined to use R.J. Reynolds' proposed instructions that included a requirement that, in order to find that Mr. Ciccone's PVD "manifested" prior to November 21, 1996, "a reasonable person" would have been on notice of the causal connection between smoking and his condition. Instead, the trial court instructed the jury that "manifestation" occurred when Mr. Ciccone "experienced symptoms of [PVD] or was diagnosed with [PVD]."

Specifically, the trial court instructed the jury as follows:

> The second question on the verdict is: Did George Ciccone's peripheral vascular disease (PVD) manifest itself prior to November 21st, 1996?
> In this case "manifest" is defined as <u>the time when Mr. Ciccone experienced symptoms of peripheral vascular disease or was diagnosed with peripheral vascular disease</u>.

(Emphasis added.)

The special interrogatory verdict asked the following three questions, all of which the jury answered in the affirmative:

> 1. Was George Ciccone addicted to cigarettes containing nicotine, and if so, was that addiction a legal cause of his peripheral vascular disease (PVD)?
> If your answer to Number 1 is Yes, proceed to Number 2. If No, your verdict is for the defendant on this issue. Please proceed to Number 3.
> 2. Did George Ciccone's peripheral vascular disease (PVD) manifest prior to November 21, 1996?
> If your answer to Number 2 is Yes, proceed to Number 3. If No, your verdict is for the defendant on this issue. Please proceed to Number 3.
> 3. Did George Ciccone have lung cancer caused by smoking, and if so, was that lung cancer a legal cause of his death?

It was undisputed that Mr. Ciccone's PVD was not <u>diagnosed</u> until after the November 21, 1996, cut-off date for <u>Engle</u> class membership. Thus, pursuant to the trial court's definition of "manifestation," the issue of membership in the <u>Engle</u> class turned on whether Mr. Ciccone had experienced any symptoms of PVD before the November 21, 1996, cut-off date for class membership. As the Fourth District noted, the trial court "emphasized that Ciccone could meet this burden only through expert testimony, and could not rely 'just in general [on] any symptomology that some layman could take to' be one ailment or another." <u>Ciccone</u>, 123 So. 3d at 607.

During Phase I of the trial, R.J. Reynolds and Ciccone advanced differing interpretations of the competing expert testimony presented to prove

"manifestation" of Mr. Ciccone's PVD.  The jury ultimately decided the issue of

Engle class membership in favor of Ciccone, and the relevant facts are not in

dispute for purposes of the legal issue before this Court.  The Fourth District set

forth those facts as follows:

### Ciccone's Case as to "Manifestation"

To establish the deceased's manifestation of PVD caused by smoking, Ciccone called two expert witnesses: Dr. Michael Hirsch, the deceased's treating physician, and Dr. Allan Feingold, the deceased's pulmonologist.  Dr. Hirsch characterized the deceased as a "very difficult" and "tough" patient, in that it was "difficult to convince [him] to take advice from physicians."  When the deceased first arrived at the doctor's office in 1988, Dr. Hirsch described him as "relentless" in his chain smoking, routinely smoking three to four packs of cigarettes per day.  By April 6, 1990, Dr. Hirsch diagnosed the deceased as having a nicotine addiction and recommended that he use certain medication and nicotine patches.

On June 27, 1991, the deceased returned to Dr. Hirsch's office complaining of "chronic back pain," with such pain radiating down his leg and hip.  The doctor performed an MRI scan and an x-ray of the deceased's lumbar spine.  The scan showed, among other things, the existence of spondylosis and vascular sclerosis, common signs of early stage PVD.  Nevertheless, Dr. Hirsch testified that "nothing was done about it" because the deceased "wasn't having any symptoms . . . at the time" since the disease "takes a long time to develop," particularly where it attacked the aortic area, as it did in the deceased.

From 1991 through 1998, the deceased managed to avoid doctors and his condition continued to worsen.  A co-worker of the deceased from 1994 through 1995 testified that the deceased had trouble using ladders and walked with a noticeable limp, persistently favoring his right side.  Due to such problems, when carpooling, the deceased would request the co-worker to drop him off close to their place of employment so he would not have to walk a great distance.  Likewise, the deceased's stepson testified that by the time of the stepson's 1995 wedding, the deceased's leg issues had worsened to

the point that he had difficulty getting up stairs and could not even dance with the bride.

In 1998, the deceased reported the problems to his doctors, at which point he was sent to a neurosurgeon to address his back problems. From there, he also went to a vascular surgeon to address his "claudication problems," which Dr. Hirsch described as "pain that occurs . . . with exertion that's due to [PVD,] narrowing of the artery, [and] lack of blood flow to the area." By 1999, the deceased was finally diagnosed as having PVD; to address the disease, he then had bypass surgery, which cleared up much of the symptoms that had manifested in his leg.

Dr. Feingold corroborated much of Dr. Hirsch's observations, testifying that the deceased's first manifestation of PVD was evidenced by the 1991 lumbar spine x-ray, even though this only showed a "soft" condition. Thereafter, Dr. Feingold opined that by 1994 through 1995, the pain the deceased experienced in his right leg while walking, as described by the co-worker and stepson, was consistent with symptoms of intermittent claudication caused by PVD.

Additionally, Dr. Feingold testified that by the time the deceased finally had bypass surgery in 1999, his PVD had reached a "serious" state of late stage development, evidenced by the fact that he was exhibiting no blood flow below the inguinal zone. This level of "seriousness," in Dr. Feingold's opinion, was extremely important to pinpointing when the "manifestation" of the disease occurred, since such a level of PVD takes "at least more than five years" to develop. Although Dr. Feingold later admitted on cross examination that the deceased never exhibited the classic first signs of PVD, he opined that the deceased's back injuries made subsequent symptoms appear "misleading."

**The Defense's Case**

R.J. Reynolds called Dr. David Charles Brewster, a vascular surgeon, who opined that the deceased's PVD symptoms first arose in early 1998. To support his opinion, Dr. Brewster described PVD as "a thickening deposit on the wall of the artery, which, if it progressively worsens, will begin to narrow the artery." In conjunction with this definition, Dr. Brewster explained that the earliest sign of PVD is a claudication, which takes effect only when one is either walking or exercising. Thereafter, once the PVD gets

worse, the patient will lose his pulse along with the hair on his extremity.

As applied to this case, Dr. Brewster stated that the deceased was not suffering from PVD prior to 1998, since, during that time, the pain he felt was present both when he walked and while he was at rest. Dr. Brewster bolstered his opinion by observing that the deceased failed to show many of the telltale signs of PVD, such as loss of hair on his extremity, short or thin appearance of the skin, or loss of pulse in the ankle. As a result, Dr. Brewster opined that the pain the deceased felt in his leg during this time was attributable to his back problems, particularly a ruptured disk and nerve root compression.

Id. at 607-08.

After the conclusion of Phase I of the trial, R.J. Reynolds moved for a directed verdict, contending that Ciccone had "failed to present sufficient evidence to establish her membership in the Engle class." Id. at 608. The trial court "decided to submit the fact question of class membership to the jury," which ultimately found Ciccone to be a member of the Engle class. Id.

The trial then proceeded to a "Phase II," during which "the jury was tasked with deciding whether R.J. Reynolds was liable under Ciccone's compensatory damages claims, and whether Ciccone was entitled to punitive damages. The jury found in favor of Ciccone on her claims of negligence, strict liability, and gross negligence." Id. The jury rejected, however, the fraudulent concealment and civil conspiracy claims that it was asked to decide, finding in favor of R.J. Reynolds on those issues. Id.

- 10 -

As to damages, the jury awarded Ciccone $196,222.35 for medical and funeral expenses and $3,000,000.00 in noneconomic compensatory damages. Id. In addition, the jury found by clear and convincing evidence that punitive damages were warranted and awarded Ciccone $50,000.00 in punitive damages on her claim of gross negligence. Id. at 608-09. Pursuant to the jury's apportionment of 70% of comparative fault to Mr. Ciccone, the trial court entered a final judgment against R.J. Reynolds in the amount of $1,008,866.70. Id. at 606.

On appeal to the Fourth District, R.J. Reynolds argued "that the trial court twice erred in handling the issue of Ciccone's class membership"—first, by "erroneously instructing the jury that the deceased's manifestation of PVD occurred when he had 'symptoms' of the disease, instead of when the deceased was on notice of the causal connection between his smoking and his PVD"; and, second, "by failing to grant a directed verdict in the defense's favor since Ciccone failed to present any competent evidence that the deceased's PVD manifested prior to November 21, 1996." Id. at 609. R.J. Reynolds also challenged the award of punitive damages under the gross negligence theory, on the basis that punitive damages for gross negligence were not pled in the original Engle class action and therefore were unavailable for this claim. Id. at 616.

The Fourth District affirmed "in all respects but one," rejecting in full R.J. Reynolds' arguments on the "manifestation" issue and reversing only the award of

- 11 -

punitive damages.  Id. at 606.  The Fourth District held that the trial court correctly instructed the jury regarding the "manifestation" of Mr. Ciccone's PVD for the purpose of determining Engle class membership because " 'it is enough that the decedent have suffered a medical condition that first' became symptomatic before November 21, 1996."  Id. at 614 (internal citation omitted).  As to the denial of R.J. Reynolds' motion for a directed verdict, the Fourth District also affirmed, concluding that the jury was not required to accept the defense's expert testimony that Mr. Ciccone's pre-November 1996 symptoms were not attributable to PVD. Id. at 616.

The only error recognized by the Fourth District was "in allowing Ciccone to recover punitive damages under the theory of gross negligence since that cause of action was not pled in the original Engle class case and the jury found for the defense on the concealment and conspiracy claims."  Id.  On the punitive damages issue, the Fourth District adopted the First District's analysis in Soffer v. R.J. Reynolds Tobacco Co., 106 So. 3d 456, 460 (Fla. 1st DCA 2012), quashed, No. SC13-139, 2016 WL 1065605 (Fla. Mar. 17, 2016), "which held that Engle progeny plaintiffs may recover punitive damages only on claims for concealment or conspiracy."  Ciccone, 123 So. 3d at 616.

Accordingly, the Fourth District affirmed the final judgment in all aspects other than as to punitive damages and remanded to the trial court for the entry of a

final judgment that eliminated the $50,000.00 punitive damages award. Id. at 617.

The Fourth District also certified conflict with the First District's decision in

Castleman, 97 So. 3d at 877, in which the First District held that a disease or

condition "manifests" itself as a tobacco-related illness for the purpose of Engle

class membership only when the plaintiff knew or reasonably should have known

of the causal connection between tobacco and the illness so as to be able to initiate

a nonfrivolous tort lawsuit against the tobacco company on the basis of physical,

observable symptoms. Ciccone, 123 So. 3d at 617.

**ANALYSIS**

The certified conflict issue in this case involves defining "manifestation" of

the plaintiff's tobacco-related disease or medical condition for purposes of

establishing membership in the Engle class. This Court's standard of review for

this purely legal certified conflict issue and our determination of the correct

definition of "manifestation" for Engle class membership is de novo. See Engle,

945 So. 2d at 1274 ("Questions of law are reviewed de novo.").

In analyzing this issue, we begin with this Court's decision in Engle, which

sets forth the background and necessary framework for considering the proper

definition of "manifestation." Then, we address why R.J. Reynolds' arguments

regarding statute of limitations principles and "opt-out" rights are inapplicable in

- 13 -

this context. We conclude by explaining why the Fourth District's approach is consistent with <u>Engle</u>.

## I. This Court's Decision in <u>Engle</u>

Determining the scope of <u>Engle</u> class membership must begin with how this Court described the class in our 2006 decision from which this progeny case originates. In <u>Engle</u>, 945 So. 2d at 1274-75, this Court rejected the class plaintiffs' argument that the class could be "open-ended." We agreed with the tobacco companies that there was a "cut-off date" for class membership rather than an open-ended class and stated that the "plain language of the class certification indicates that the trial court anticipated that the class would be cut off or limited to the date of final certification." <u>Id.</u> at 1275. This Court stated that it was "reasonable" to conclude that "the date of the trial court's November 21, 1996, order that recertified a narrower class is the appropriate cut-off date" for class membership. <u>Id.</u> at 1255, 1275.

As we stated, "the class is described as those 'who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.' " <u>Id.</u> at 1275-76 (emphasis omitted) (quoting <u>Engle</u>, 672 So. 2d at 40). "The phrase 'who have suffered, presently suffer or have died' supports the view that the class should include only those

- 14 -

people who were affected in the past or who were presently suffering at the time the class was recertified by the trial court." Id. at 1275.

In discussing the cut-off date, this Court emphasized that diagnosis of the tobacco-related disease or medical condition was not the "critical event" for establishing class membership. Id. at 1275-76. Specifically, according to this Court's opinion, the "critical event is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself." Id. at 1276 (second emphasis added). Indeed, this Court noted that " 'diagnosis' as a qualifying factor does not appear anywhere in the description of the class certified." Id. at 1275.

This Court's discussion of class representative Della Vecchia is instructive in considering the necessary showing for establishing Engle class membership. According to this Court, "Della Vecchia's medical records indicate that she had been suffering from a tobacco-related disease prior to the time of certification," and was therefore "properly included as a class member." Id. at 1276 (emphasis added). In addressing Della Vecchia's membership in the Engle class, this Court pointed to notations by Della Vecchia's doctors of having "a past medical history of 'COPD' and significant hypertension" in "early 1997." Id.

Significantly, nowhere did this Court state that, to establish Engle class membership, Della Vecchia was required to have knowledge that her symptoms

were caused by smoking.  Indeed, there was no indication of when Della Vecchia even knew of her symptoms, and this Court required nothing more than medical records indicating that "she had been suffering from a tobacco-related disease" prior to the "cut-off" date.  Id.

In holding that "manifestation" of the tobacco-related disease or medical condition is the determining factor for Engle class membership, this Court was cognizant of crafting a "finite class," rather than one that was "open-ended."  Id. at 1274-75.  "A finite class is necessary," this Court explained, "to avoid multiple similar lawsuits and to make legal process more effective and expeditious, important goals of a class action suit."  Id. at 1275.  This Court thus imposed a "cut-off date" of November 21, 1996.  Id.

Nowhere in Engle did this Court hold that establishing class membership required any type of knowledge regarding the connection between smoking and the disease or medical condition prior to November 21, 1996.  Rather, this Court consistently referred to whether the plaintiff was "suffering from a tobacco-related disease" before the class was recertified by the trial court on November 21, 1996, as the "critical event" in establishing whether the disease or condition had "manifested itself."  Id. at 1275-76 (emphasis added).

The issue of class membership became especially important in light of this Court's approach to the Engle litigation since our 2006 decision.  In particular, this

Court held in Engle that "continued class action treatment" was "not feasible" and that the class must therefore be decertified to allow each class member the opportunity to file an individual lawsuit against the tobacco companies to determine entitlement to compensatory and punitive damages. Id. at 1277.

However, this Court "did not decertify the class in the traditional sense, but conferred upon the class members two benefits: (1) each class member's time to file an individual suit would be equitably tolled to allow filing within one year of the court's decision, and (2) in the individual action, the Engle jury's 'common core findings' in Phase I would be given 'res judicata effect.' " Ciccone, 123 So. 3d at 609-10 (quoting Engle, 945 So. 2d at 1269). Determining Engle class membership thus became critical in progeny cases after this Court's decision because only individual plaintiffs "within the class" as of the trial court's November 21, 1996, order were permitted to use the "res judicata" effect of the Engle jury's Phase I common core findings. Engle, 945 So. 2d at 1277.

## II. The Certified Conflict

R.J. Reynolds advances two primary arguments before this Court as to why the Fourth District allegedly erred in concluding that there is no knowledge requirement for establishing "manifestation." First, R.J. Reynolds asserts that the Fourth District erred in rejecting well-settled principles from the statute of limitations context, which derive from "creeping disease" cases and require the

- 17 -

plaintiff to have knowledge of the causal connection between the symptoms and the cause of action. Second, R.J. Reynolds contends that the Fourth District's decision undermines the ability of a plaintiff to exercise any meaningful "opt-out" right, in contravention of Engle and class actions more generally. We address each argument in turn.

## A.  Statute of Limitations Principles Do Not Apply

As to R.J. Reynolds' first argument, we conclude that statute of limitations principles are inapplicable to the "manifestation" issue of Engle class membership. The Fourth District directly and persuasively addressed this issue, explaining why the policy concerns driving cases involving the accrual of a cause of action for statute of limitations purposes have no bearing on the policy for requiring "manifestation" to prove membership in the Engle class. Reviewing this Court's decision in Carter v. Brown & Williamson Tobacco Corp., 778 So. 2d 932 (Fla. 2000), a "creeping disease" case relied on by R.J. Reynolds and the dissent, the Fourth District stated that the policy behind requiring knowledge in the statute of limitations context "reflects common sense," as "it is both illogical and unfair for the statute to begin to run before the plaintiff knows or should have known of the causal connection that is the basis for his suit." Ciccone, 123 So. 3d at 611.

Indeed, while R.J. Reynolds and the dissent place much emphasis on Carter and the "creeping disease" line of cases, the rationales of those cases in resolving

- 18 -

statute of limitations issues are not, as R.J. Reynolds contends, easily transplanted to the issue of Engle class membership. In Carter, 778 So. 2d at 934, this Court held that the statute of limitations begins to run in a products liability cause of action involving a "creeping disease" when "the accumulated effects of the deleterious substance manifest themselves to the claimant in a way which supplies some evidence of a causal relationship to the manufactured product." This Court based its holding in Carter on what the Fourth District in Ciccone accurately described as "concerns about fairness to the plaintiff." Ciccone, 123 So. 3d at 611.

Specifically, Carter and other "creeping disease" cases, by their very nature, involve latent illnesses that are acquired "as a result of long-term exposure to injurious substances," where the deleterious effects that give rise to the cause of action may not become symptomatic for many years after the initial exposure. Carter, 778 So. 2d at 936-37. For this reason, "the connection between a plaintiff's initial symptoms and a defendant's conduct can remain unknown until reaching a later stage of worsened development." Ciccone, 123 So. 3d at 610.

A "creeping disease" presents unique problems in the statute of limitations context, where a plaintiff in Florida has only four years to bring a products liability claim "from the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence." §§ 95.031(2)(b), 95.11(3), Fla. Stat. Yet, it is clear that a plaintiff should not, and

- 19 -

cannot, be required to file a cause of action before even realizing that the cause of action exists. Such a rule would, as the Fourth District cogently articulated, completely undermine the purpose of statutes of limitations:

> [I]n the context of "creeping diseases," the requirement of knowledge of the causal connection between the infirmity and the product is grounded in balancing fairness to the plaintiff with the policy driving the statute of limitations. The primary purpose of a statute of limitations is to compel the exercise of a right of action within a reasonable time "to protect defendants from unfair surprise and stale claims." Major League Baseball v. Morsani, 790 So. 2d 1071, 1074-75 (Fla. 2001); see 35 Fla. Jur. 2d, Limitations and Laches § 1 (2013). If courts were to find that "creeping diseases" "manifest" at first sign of "symptoms," such policy would be disserved, as the statute of limitations would bar plaintiffs from pursuing fruitful causes of action before the plaintiff even knows enough "to commence a non-frivolous tort lawsuit." Frazier [v. Philip Morris USA, Inc., 89 So. 3d 937, 946 (Fla. 3d DCA 2012)].

Ciccone, 123 So. 3d at 612.

Unlike the statute of limitations context, where the statute itself actually requires a reasonable plaintiff to know of the existence of the cause of action, there is no corresponding policy concern underlying the establishment of membership in the Engle class. This Court has clearly held that diagnosis of the tobacco-related disease or medical condition is not required in order to be included in the Engle class. As the Fourth District explained, the deadline imposed by this Court for keeping the class from becoming "open-ended" was not "tied to the plaintiff's knowledge." Id. at 613. Instead, "all a plaintiff had to show was that he or she was included among 'those people who were affected in the past or who were

- 20 -

presently suffering <u>at the time the class was recertified by the trial court</u>.' " <u>Id.</u> (quoting <u>Engle</u>, 945 So. 2d at 1275).

Placing a burden on the plaintiff to have knowledge of the causal connection between symptoms and smoking would, thus, actually require the plaintiff to know as much or more than a medical professional—that is, only plaintiffs with a competent doctor who is able to quickly link the correct illness with smoking, or those plaintiffs who are particularly sophisticated on their own, would be able to establish class membership. Again, this is a point the Fourth District clearly recognized:

> [A]s shaped by the Supreme Court under the unique circumstances of <u>Engle</u>, the question of class membership is a fact issue viewed with the benefit of hindsight from the vantage point of 2006, where expert testimony may establish the link between a plaintiff's concrete symptoms and tobacco; class membership is not an inquiry into the abstraction of what a plaintiff knew or should have known over ten years earlier. The unfairness to a plaintiff that informs the knowledge requirement of the statute of limitations cases is absent in this scenario. The term "manifested" as used in <u>Engle</u> has a narrower definition than that given to it in <u>Castleman</u>. As the plaintiff argues in her brief, the Supreme Court's use of the term "manifested" in <u>Engle</u> signifies an "event that is neither dependent on the skill of the [treating] physician nor the sophistication of the patient—it is enough that the decedent have suffered a medical condition that first" became symptomatic before November 21, 1996.

<u>Id.</u> at 613-14.

Simply put, the policy undergirding the "manifestation" of an injury for the accrual of a cause of action is not the same as the policy rationale for the

- 21 -

"manifestation" requirement to establish Engle class membership. Accrual is simply not the relevant inquiry for determining Engle class membership. If anything, the concerns about fairness to the plaintiff that drive the knowledge requirement for purposes of the statute of limitations actually compel the opposite result here. Because R.J. Reynolds' argument regarding statute of limitations principles "fails to take into account the differences in policy between the accrual of a cause of action for the purpose of the statute of limitations and pinpointing a date for class membership by looking back in time from the 2006 Engle decision," id. at 613, this argument is unavailing as a justification for rejecting the Fourth District's definition.

## B. The Fourth District's Definition is Consistent with Engle

R.J. Reynolds also contends that the Fourth District's interpretation of "manifestation" is erroneous because it is inconsistent with the "opt-out" rights of a plaintiff in a class action lawsuit, in that a plaintiff with no reason to know that he or she is included in the class could not meaningfully determine whether to join the class and be bound by any final judgment or whether to "opt-out" and proceed individually against the defendant in a separate cause of action. In support of this argument, R.J. Reynolds points to an order entered by the Engle trial court in January 1998, in which the trial court stated that class members must be "residents of the state of Florida at the time of [the] medical diagnosis or at the time [the]

evidence of the causal relationship of the cause of action had manifested itself." R.J. Reynolds contends that this order demonstrates that, in order to exercise a meaningful right to "opt out," the potential Engle class member must have known about the connection between smoking and his or her symptoms, particularly when considered in conjunction with the trial court's November 1996 notice informing Florida smokers that they were not members of the Engle class if they had "not manifested or been diagnosed with any disease or medical condition caused by [their] addiction to cigarettes that contain nicotine."

As Ciccone points out, however, the trial court's January 1998 order concerned the accrual of the cause of action for determining the proper choice of law—in other words, this order invokes the inapplicable statute of limitations principles that have no impact on the issue of Engle class membership. Moreover, R.J. Reynolds' citation to the trial court's orders does not assist in analyzing the "manifestation" issue because R.J. Reynolds reads a knowledge requirement into the definition that simply is not there. "Rather, the requirements for class membership are: (1) that the plaintiff was a Florida resident, (2) that he or she either suffered or was suffering from a smoking related illness before November 21, 1996, and (3) that his or her addiction to nicotine caused the disease." Ciccone, 123 So. 3d at 614. The "key point in determining Engle class membership," as stated by the Fourth District based on the correct interpretation of this Court's

decision in Engle, "is pinpointing when the plaintiff began 'suffering' from the smoking-related illness." Id. at 615 (quoting Engle, 945 So. 2d at 1275).

In any event, the trial court orders cited by R.J. Reynolds are not dispositive for the additional reason that this Court's 2006 Engle decision is the pertinent point of reference for defining the scope of the Engle class in progeny cases. This Court clearly held that the class included "those people who were affected in the past or who were presently suffering at the time the class was recertified by the trial court." Engle, 945 So. 2d at 1275. That definition did not include any requirement of knowledge—only a requirement of past or present "suffering" of tobacco-related symptoms.

Further, the current procedural posture of the litigation, where the class was actually decertified moving forward, differentiates Engle progeny cases from typical class actions. The Engle class was closed by this Court's Engle decision itself. While R.J. Reynolds, echoed by the dissent, contends that defining "manifestation" without reference to knowledge of causality would violate potential class members' right of access to the courts and eliminate the "mutuality" necessary for the Engle jury's Phase I findings to be given preclusive effect— because it would expand the class too broadly—this Court already clearly defined the parameters of the "finite class" in Engle to avoid these concerns. Id.

The Engle class could have continued for even longer than the date of the trial court's recertification order—indeed, this Court explicitly noted in Engle that the "final class description could lead one to believe that the class is open-ended because there is no stated cut-off date for membership." Id. at 1274. But this Court declined to permit such an "open-ended" class, recognizing the date of final class certification as the "cut-off date for class membership," in order to "avoid multiple similar lawsuits and to make legal process more effective and expeditious, important goals of a class action suit." Id. at 1275. It was in this context of explaining why the class could not be "open-ended," and not in the context of explaining the necessary "manifestation" of symptoms, that this Court referenced the access to courts and "mutuality" issues R.J. Reynolds now improperly attempts to rely on.

For similar reasons, R.J. Reynolds' reliance on Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997), and alleged federal due process concerns, are also misplaced. R.J. Reynolds cites to Amchem Products in asserting that the "Fourth District's extension of Engle class membership to individuals who had no reason to know they might have a smoking-related condition rendered meaningless the notice and opt-out rights protected by the Florida Rules of Civil Procedure and by the state and federal constitutions." In particular, R.J. Reynolds asserts that the Supreme Court in Amchem Products "rejected a class certification in an asbestos

- 25 -

case that included exposure-only plaintiffs who 'may not even know of their exposure, or realize the extent of the harm they may incur.' " 521 U.S. at 628.

But, in Amchem Products, the United States Supreme Court confronted a class much different than the Engle class. It was a class described by the Supreme Court as "sprawling"—the very type of "open-ended" class this Court was careful to avoid in Engle. 521 U.S. at 622. And, because the Supreme Court concluded that the class in Amchem Products could not "satisfy the requirements of common issue predominance and adequacy of representation," the Supreme Court did not "definitively" rule on the notice provided. Id. at 628. There were, in addition, numerous other factors present in Amchem Products, not present in Engle, that impacted the Supreme Court's decision, including that the class was for settlement purposes only, id. at 620, and that the class members would be bound by the settlement even though they were not suffering from any disease, id. at 628. Accordingly, Amchem Products is wholly distinguishable.

In sum, this Court carefully limited the "finite class" in Engle to ensure that class membership was not "open-ended." Engle, 945 So. 2d at 1274-75. There remain numerous limitations on the scope of the class, including the statute of limitations, the one-year time bar set forth by this Court for filing an individual action based on Engle, Florida residency, and the requirement we address here that the smoker "ha[d] suffered" or be "presently suffering" from a tobacco-related

- 26 -

disease or medical condition at the time the class was recertified by the trial court. See id. at 1275-77. Knowledge of the causal link between smoking and the symptoms that the smoker previously "suffered" or was, at that time, "presently suffering," was not required by Engle, and R.J. Reynolds has offered no compelling reason this Court should now hold that a plaintiff must establish this additional element in order to prove class membership.

## CONCLUSION

For the reasons explained in this opinion, we hold that "manifestation" for purposes of establishing membership in the Engle class is defined as the point at which the plaintiff began suffering from or experiencing symptoms of a tobacco-related disease or medical condition. Under the definition we adopt, the plaintiff does not need to have been formally diagnosed or know that the symptoms were tobacco-related prior to the "cut-off date" for class membership.

Accordingly, we approve the Fourth District's definition of "manifestation" in Ciccone and disapprove the definition applied by the First District in Castleman. We, however, quash the portion of the Fourth District's decision regarding punitive damages based on our opinion in Soffer v. R.J. Reynolds Tobacco Co., No. SC13-139, 2016 WL 1065605 (Fla. Mar. 17, 2016). This case is hereby remanded to the Fourth District for further proceedings consistent with this opinion and our opinion in Soffer.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., dissenting.

The majority creates a totally different legal definition of "manifestation" to then rule that plaintiffs whose cause of action had not yet accrued at the time of Engle[3] class certification are part of the class. This newly created "manifestation" cannot be found in Engle and is contrary to Florida law governing creeping disease cases such as this one. As a result, we have two different meanings of the exact same word: (i) the meaning ascribed by the majority for the purpose of determining whether a plaintiff is a member of the Engle class; and (ii) the meaning commonly used to determine when the plaintiff's cause of action accrued. See majority op. at 22 ("differen[tiating] between the accrual of a cause of action . . . and pinpointing a date for class membership") (quoting R.J. Reynolds Tobacco Co. v. Ciccone, 123 So. 3d 604, 613 (Fla. 4th DCA 2013)). By very twisted legal reasoning, the majority uses both of these different meanings of "manifestation" to determine the certified class of Engle. I can find no justification in Engle, or

_____

3. Engle v. Liggett Grp., Inc., 945 So. 2d 1246 (Fla. 2006).

- 28 -

elsewhere, for this. The majority's decision has the effect of creating the same open-ended class that this Court specifically sought to avoid in Engle. Therefore, I respectfully dissent.

In Engle, this Court established November 21, 1996, as the cut-off date for membership in the Engle class and gave class members—namely "[a]ll [Florida] citizens and residents, and their survivors, who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine"—one year from Engle's mandate to file individual lawsuits in which they would be entitled to rely on certain findings by the class action jury. Engle, 945 So. 2d at 1256. As this Court explained in Engle, the "critical event" for determining whether an individual plaintiff is a class member is "not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself." Id. at 1276 (second emphasis added).

After Engle, two dates are relevant in determining whether an individual plaintiff who filed suit within a year of this Court's mandate may benefit from the class action jury's findings—May 5, 1990, and November 21, 1996. The first date, which is four years before the Engle class action was filed, represents the earliest date that a plaintiff's tobacco-related disease or condition could have manifested itself without the plaintiff's claims being barred by the applicable four-year statute of limitations. See Frazier v. Philip Morris USA Inc., 89 So. 3d 937, 939 (Fla. 3d

DCA 2012). The second date, which is the class membership cut-off date, represents the latest date by which a plaintiff's tobacco-related disease or condition could have manifested itself for the plaintiff to be considered a member of the Engle class. See Engle, 945 So. 2d at 1275. In other words, to be in the Engle class and therefore get the benefit of the Engle class action jury's findings, a plaintiff's tobacco-related disease or condition must have manifested itself between the statute-of-limitations bar date of May 5, 1990, and the judicially-imposed bar date of November 21, 1996.

Though this Court did not define "manifestation" in Engle, it chose to use this term, which has a well-established meaning in products liability cases involving creeping diseases (like those at issue in Engle) that is inextricably linked to the plaintiff's knowledge. Specifically, manifestation of a creeping disease is what triggers the accrual of a cause of action, and it occurs "when the plaintiff is on notice of a causal connection between exposure to the allegedly defective product and the resultant injury." Barnes v. Clark Sand Co., 721 So. 2d 329, 332 (Fla. 1st DCA 1998), approved sub nom. Pulmosan Safety Equip. Corp. v. Barnes, 752 So. 2d 556 (Fla. 2000); see also Am. Optical Corp. v. Spiewak, 73 So. 3d 120, 124 (Fla. 2011) ("[I]n cases where an alleged injury is a 'creeping-disease,' . . . the action accrues when the accumulated effects of the substance manifest themselves in a way which supplies some evidence of a causal relationship to the product.");

Carter v. Brown & Williamson Tobacco Corp., 778 So. 2d 932, 934 (Fla. 2000) (same).

In this case, resolution of the certified conflict turns on whether the same knowledge-based definition of "manifestation" that has long applied in creeping disease cases to trigger the accrual of the plaintiff's cause of action applies in determining whether the plaintiff's tobacco-related disease or condition manifested itself in time for the plaintiff to be a member of the Engle class. Specifically, the First District has held that "manifestation" of a tobacco-related disease or condition occurs, and the cause of action therefore accrues, when the plaintiff is "aware of sufficient facts to permit the filing of a non-frivolous tort lawsuit against the tobacco company." Castleman v. R.J. Reynolds Tobacco Co., 97 So. 3d 875, 877 (Fla. 1st DCA 2012) (applying this definition from the statute of limitations case Frazier, 89 So. 3d 937, to decide whether the plaintiff was a member of the Engle class).

In contrast, in the decision on review, the Fourth District rejected the First District's conclusion that the plaintiff's knowledge, and therefore the accrual of the cause of action, is relevant to the manifestation inquiry where the class cut-off date rather than the statute-of-limitations bar date is at issue. In so doing, the Fourth District held that the manifestation determination "is not an inquiry into the abstraction of what a plaintiff knew or should have known over ten years earlier,"

- 31 -

it is "viewed with the benefit of hindsight from the vantage point of 2006 [after this Court decided Engle], where expert testimony may establish the link between a plaintiff's concrete symptoms and tobacco." Ciccone, 123 So. 3d at 613-14.

Rather than concluding manifestation means now what it has always meant as the First District did in Castleman, the majority accepts that the Fourth District in Ciccone properly "differen[tiated] between the accrual of a cause of action [and] pinpointing a date for class membership." Majority op. at 22 (quoting Ciccone, 123 So. 3d at 613). In so holding, the majority ascribes a totally new meaning to the term "manifestation" in order to squeeze additional plaintiffs whose causes of action had not yet accrued as of the class cut-off date into the Engle class. In defense of its new definition, the majority states that "policy concerns" which support making the plaintiff's knowledge critical to the manifestation inquiry in the statute of limitations context do not exist where class membership is concerned: "Unlike the statute of limitations context, [which] requires a reasonable plaintiff to know of the existence of the cause of action, there is no corresponding policy concern underlying the establishment of membership in the Engle class." Majority op. at 20.

Its policy views aside, the majority is simply wrong on the law because, in the creeping disease context, if a plaintiff does not know (or should not reasonably know) of the link between the product and the injury, the cause of action simply

- 32 -

does not exist. See Carter, 778 So. 2d at 934. Under basic tort law, it is axiomatic that a plaintiff cannot sue for a cause of action that does not exist and that a cause of action does not exist until it accrues. See Hodge v. Serv. Mach. Co., 438 F.2d 347, 349 (6th Cir. 1971) ("A cause of action accrues when a suit may be maintained upon it. Black's Law Dictionary 37 (4th ed. 1951). A suit may not be brought upon a cause of action until it exists, and a cause of action does not exist until all its elements coalesce."); see also Spiewak, 73 So. 3d at 129 ("If there is no injury, there is simply no action[.]").

The same basic principle that a cause of action must exist to be sued upon also applies in the class action context. Cf. Castano v. Am. Tobacco Co., 84 F.3d 734, 737, 740-41 (5th Cir. 1996) (dismissing class action brought on behalf of "[a]ll nicotine-dependent persons in the United States" for several reasons, including that the addiction-as-injury tort sued upon was "immature").[4] Indeed, the purpose of a class action is to allow a class representative to "litigate[] the common claims of a class of individuals too numerous to join to the case individually." Newberg on Class Actions § 1:2 (5th ed.); see also 67A C.J.S. Parties § 23 ("The purpose of a class action is to provide relief for large groups of

---

[4]. In the Engle class action, the trial court avoided the "immature tort" issue by "refus[ing] to allow potential claimants who have not manifested a disease or condition to become a member of the class." Engle v. R.J. Reynolds Tobacco, No. 94-08273 CA-22, 2000 WL 33534572, at *9 (Fla. Cir. Ct. Nov. 6, 2000) (emphasis added).

people <u>with the same claim</u>[.]") (emphasis added).  Accordingly, "[t]o be a member of a class," a person must necessarily "<u>hold a claim</u> that involves questions of law and fact common to the class and [that] is typical of the class as a whole."  <u>Coleman v. Cal. Dep't of Corr. & Rehab.</u>, No. 1:11-CV-01587-RRB, 2014 WL 6964513, at *1 (E.D. Cal. Dec. 9, 2014) (emphasis added); <u>cf.</u> <u>Briggs v. Brown & Williamson Tobacco Corp., Inc.</u>, 414 F. Supp. 371, 378 (E.D. Va. 1976) (explaining that an individual who did not have an "actionable" claim against the defendant "could not properly be made part of [the class action] lawsuit").

Because, in the creeping disease context, knowledge is synonymous with the accrual of a cause of action, the majority's decision oddly turns these principles on their head by allowing individuals who held no tobacco-related causes of action as of the class membership cut-off date—because those causes of action had not yet accrued—to nevertheless gain entry into the <u>Engle</u> class.  This result is also entirely inconsistent with <u>Engle</u>.  <u>See</u> <u>Frazier</u>, 89 So. 3d at 945 ("Plainly, many symptoms or effects that might later develop to become a compensable injury attributable to smoking—shortness of breath, or persistent coughing, for example—do not in isolation provide a sufficient legal basis for initiating a lawsuit against a tobacco company.  Applying the teaching of <u>Engle</u> and the other 'creeping disease' cases, these medically—and practically[—]ambiguous

'manifestations' do not create an issue of fact for resolution by a jury or the court.").

Nothing in <u>Engle</u> indicates that this Court intended to give the term "manifestation," which has an established legal meaning within the creeping disease context, an entirely new meaning without saying it was doing so.  <u>Cf.</u> <u>Larimore v. State</u>, 2 So. 3d 101, 113 (Fla. 2008) (explaining that in assigning meaning to terms, courts "look not only to the words themselves but also to 'the context in which the language lies' ") (quoting <u>Horowitz v. Plantation Gen. Hosp. Ltd. P'ship</u>, 959 So. 2d 176, 182 (Fla. 2007)); <u>Miele v. Prudential-Bache Sec., Inc.</u>, 656 So. 2d 470, 472 (Fla. 1995) ("[W]e find that the plain meaning of 'civil action' must be derived from the context in which the language lies.").

Moreover, reading <u>Engle</u> to implicitly redefine "manifestation" is inconsistent with what this Court actually said.  Rather than say that the <u>Engle</u> class includes plaintiffs whose symptoms were insufficient to alert them to a connection between smoking and an injury, this Court described the certified class as individuals who had incurred the tobacco-related injuries necessary to assert viable causes of action.[5]  <u>See</u> <u>Engle</u>, 945 So. 2d at 1254 (explaining that <u>Engle</u> is a

_____

5. In fact, the class action notice specifically told individuals who had no reason to connect their symptoms to smoking that they were not members of the class:  "You are <u>not</u> a member of the class . . . if you are a smoker or former

- 35 -

"smokers' class action lawsuit that sought damages against cigarette companies and industry organizations for alleged smoking-related injuries").  Similarly, when it set the class cut-off date, this Court did not purport to make the class action jury's findings available to plaintiffs whose tobacco-related causes of action had not yet accrued.  See Engle, 945 So. 2d at 1270 n.12 ("[C]lass members [are] those individuals who fit the class description as of the November 21, 1996, cut-off date[.]") (emphasis added).

        To the contrary, in Engle, this Court held that two of the class representatives' claims fell within the applicable May 5, 1990, to November 21, 1996, time range while a third class representative's claims did not, without any indication by the Court that a different test should be applied for determining whether the plaintiffs' tobacco-related diseases or conditions manifested too soon rather than too late.  See id. at 1276.  In analyzing whether the class representatives were members of the Engle class, though this Court took issue with the district court's use of diagnosis instead of "manifestation" as the relevant benchmark, see id., it did not quarrel with the district court's reasoning that to determine whether the class representatives were properly members of the class turns on when their causes of action accrued.  See Liggett Grp. Inc. v. Engle, 853 So. 2d 434, 453 n.23

---

smoker who has not manifested or been diagnosed with any disease or medical condition caused by your addiction to cigarettes that contain nicotine."

(Fla. 3d DCA 2003) ("[J]udgment should have been entered in favor of the defendants as to individual plaintiffs Farnan and Della Vecchia <u>because their claims did not accrue until years after the cut-off date for class membership</u>.") (emphasis added). Accordingly, the only reasonable way to apply the judicially-imposed bar date in <u>Engle</u> consistent with our precedent concerning the "manifestation" of creeping diseases is to conclude that this Court closed the class to smokers whose tobacco-related causes of action had not accrued as of November 21, 1996.

By viewing the question of whether a plaintiff is properly a member of the <u>Engle</u> class with "the benefit of hindsight from the vantage point of 2006," <u>Ciccone</u>, 123 So. 3d at 613, rather than looking to whether the plaintiff's cause of action existed on November 21, 1996, the majority creates an entirely new definition of the word "manifestation" that has nothing to do with when the plaintiff's tobacco-related cause of action accrued. The majority's definition is wrong based on our precedent defining "manifestation" in the context of creeping disease cases. Worse still, it creates two different tests for admission into the same class, with the deciding factor as to which test applies being whether the plaintiff's injury allegedly manifested too soon or too late. The deciding factor as to whether a plaintiff is a member of the <u>Engle</u> class should not be which bar date is at issue. Rather, consistent with the established definition of "manifestation," whether the

- 37 -

plaintiff is a member of the <u>Engle</u> class should turn on when the plaintiff's tobacco-related cause of action accrued.

Indeed, by failing to define "manifestation" consistent with our creeping disease precedent, the majority subjects the <u>Engle</u> class to the type of open-endedness this Court sought to avoid by closing it. In doing so, the majority renders <u>Engle</u> unconstitutional as applied in cases where the plaintiff's tobacco-related cause of action had not accrued as of the cut-off date.

Specifically, the majority's decision violates the tobacco defendants' due process rights (by allowing plaintiffs who are not proper class members to benefit from the class action jury's findings). <u>See</u> <u>Engle</u>, 945 So. 2d at 1275 ("One-way intervention" into an open-ended class would have "the effect of giving collateral estoppel effect to the judgment of liability in a case where the estoppel was not mutual.") (quoting <u>Katz v. Carte Blanche Corp.</u>, 496 F.2d 747, 759 (3d Cir. 1974)); <u>cf.</u> <u>Salisbury v. Kroyer Heating & Air Conditioning</u>, 683 F. Supp. 177, 181 (N.D. Ohio 1986) ("The doctrine of res judicata applies, for due process reasons, only against parties and their privies, and does not affect strangers to the litigation."). Indeed, the fact that "the claims in <u>Engle</u> and the claims in individual actions . . . are <u>the same causes of action</u> between <u>the same parties</u>" was critical to our recent decision denying the tobacco defendants' due process challenge to giving the

- 38 -

Engle findings "res judicata effect" in individual actions. Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 432 (Fla. 2013).

But the constitutional implications of the majority's decision are not just limited to the defendants. The majority's decision is also contrary to the plaintiffs' notice and opt-out rights (by imposing class membership upon individuals who had no reason to know they were class members). See Engle, 945 So. 2d at 1274-75 ("[A]n open-ended class would not allow for notice and an opportunity to opt out as required by [Florida Rule of Civil Procedure] 1.220(d)(2) and may implicate potential class members' right of access to the courts under article I, section 21 of the Florida Constitution."); cf. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 628 (1997) (recognizing the constitutional implications of a class action notice that is insufficient to inform putative class members that they are in fact members of the class). The majority dismisses these concerns, stating that "this Court already clearly defined the parameters of the 'finite class' in Engle to avoid the[m]." Majority op. at 24. However, the fact that Engle created parameters is of no help when the majority interprets the significant parameter of the class cut-off date in a way that renders it meaningless.

Unlike the majority, I would not torture Engle to allow plaintiffs whose tobacco-related causes of action had not accrued as of the class cut-off date to

- 39 -

nevertheless be members of the class.[6]  Rather, I would approve the First District's

decision in <u>Castleman,</u> applying the same knowledge-based definition of

"manifestation" from the statute of limitations context to determine class

membership in <u>Engle</u>.  Accordingly, I would also disapprove the Fourth District's

decision to the contrary in <u>Ciccone</u>, and remand this case for a new trial.

I respectfully dissent.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal - Direct
Conflict of Decisions

Fourth District - Case No. 4D11-3807

(Broward County)

Eric L. Lundt and Gordon James, III of Sedgwick LLP, Fort Lauderdale, Florida;
Gregory George Katsas and Noel J. Francisco of Jones Day, Washington, District
of Columbia; and Charles Richard Allan Morse of Jones Day, New York, New
York,

for Petitioner

---

6. Simply because these individuals are not part of the <u>Engle</u> class does not
mean they are without recourse since they may file their own actions within the
applicable statute of limitations.  Indeed, the plaintiff in <u>Ciccone</u> filed suit in
2004—two years after her husband died of lung cancer—and only claimed she was
a member of the <u>Engle</u> class after our decision gave several of the class action
jury's findings res judicata effect.  <u>See</u> <u>Ciccone</u>, 123 So. 3d at 606.

Bard Daniel Rockenbach of Burlington & Rockenbach, P.A., West Palm Beach, Florida, and William Joseph Wichmann of the Law Offices of William J. Wichmann, P.A., Fort Lauderdale, Florida,

for Respondent