PARIENTE, J.
The certified conflict issue in this case requires us to define the term “manifestation” as it applies to the plaintiffs tobacco-related disease or medical condition for purposes of establishing membership in the Engle class based on our decision in Engle v. Liggett Group, Inc., 945 So.2d 1246 (Fla.2006).[1] The resolution of this narrow issue ultimately turns on our interpretation of this Court’s prior decision in Engle.
In Engle, this Court stated that the “cut-off date” for - class membership was November 21, .1996 — the date the trial court recertified the class — and. described the class as those “who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.” Id. at 1275-76 (emphasis omitted) (quoting R.J. Reynolds Tobacco Co. v. Engle, 672 So.2d 39, 40 (Fla.3d DCA 1996)). The “critical event” in establishing membership in the Engle class, this- Court held, “is not when an illness was actually diagnosed by a physician, but when the disease- or condition first manifested itself.” Id. at 1276 (second emphasis added). [1]
Applying this Court’s Engle decision, the Fourth District Court of Appeal concluded in R.J. Reynolds Tobacco Co. v. Ciccone, 123 So.3d 604, 615 (Fla. 4th DCA 2013), that , the “key point in determining Engle class membership is pinpointing when the plaintiff began ‘suffering’ from the smoking-related illness or when the illness ‘manifested.’” Under this definition of “manifestation,” the “plaintiffs pre-1996 knowledge of a causal link between symptoms and tobacco is unnecessary for class membership.” Id. at 614.
The First District Court of Appeal reached a contrary. conclusion in Castleman v. R.J. Reynolds Tobacco Co., 97 So.3d 875 (Fla. 1st DCA 2012). Relying on inapplicable precedent from the statute of limitations context, the First District defined “manifestation” for purposes of Engle class membership as the point at which the plaintiff knew or reasonably should have known of the causal connection between tobacco and the plaintiff’s illness to permit the filing of a nonfrivolous tort lawsuit. Castleman, 97 So.3d at 877.
We resolve this conflict by concluding that “manifestation” for purposes of establishing membership in the Engle class means the point at which the plaintiff began suffering from or experiencing symptoms of a tobacco-related disease or medical condition. Under the definition we *1031 adopt, the plaintiff does not need .to have been formally diagnosed or know that the symptoms were tobacco-related prior to the “cut-off date” for class membership. Accordingly, we approve the Fourth District’s definition of “manifestation” in Cic-cone and disapprove the definition applied by the First District in Castleman.[2]
Our holding does not, as the dissent asserts, subject the Engle class to the type of open-endedness this Court specifically avoided in the Engle decision itself. See dissenting op. at 1045. If not for this Court’s limitations on the scope of the class, the “final class description could lead one to believe that the class is open-ended because there is no stated cut-off date for membership.” Engle, 945 So.2d at 1274.
In Engle, we defined the cut-off date to specifically avoid that result and a potential unfairness to the tobacco companies. Here, we interpret that definition in light of the unique posture of the litigation, in order to avoid unfairness • to either the plaintiffs or the tobacco companies.. Numerous limitations on the scope, of the class still exist — the statute of limitations, the one-year time bar from the time of the mandate in this Court’s 2006 decision for filing an individual action, Florida residency, and the requirement that the smoker “have suffered” or be “presently suffering” from a tobacco-related disease or medical condition as of the cut-off date. See id. at 1275-77.
FACTS AND BACKGROUND
This case involves a lawsuit filed in 2004 against R.J. Reynolds ‘ Tobacco Company, by plaintiff Pamela Ciccone, as the personal representative of the estate of her deceased husband,' George Ciccone, a smoker from the age of eight who died of lung cancer in 2002. After our Engle, decision was issued, Ciccone amended her complaint “to reflect her membership ■ in the Engle class, alleging that, prior to the cut-off date [for class membership] of November 21, 1996, her husband developed peripheral vascular disease (“PVD”), a smoking-related illness that results in the thinning of arteries and lack of circulation in, the extremities.” Ciccone, 123 So.3d at 606. As a result of her husband’s tobacco-related illness, Ciccone ultimately asserted, in her fourth amended complaint, seven counts against defendant RJ. Reynolds: (1) strict liability; ■ (2) breach of express warranty; (3) 'breach of implied warranty;- (4) civil conspiracy to fraudulently conceal; (5) fraudulent concealment; (6) gross negligence; and (7) negligence. Id.
According to the framework for tobacco litigation established in Engle, Ciccone’s case proceeded to a. “Phase I” trial, in which, if she. established Engle class membership, she would receive the benefit of res judicata effect of the' Engle juiy’s “common core findings”' regarding the issues of liability and general causation. See Engle, 945 So.2d at 1255, 1269. “Much of the trial’s Phase I centered upon Ciccone’s assertion of Engle class membership, most notably whether the onset of the deceased’s PVD ‘manifested’ prior to November 21, 1996.” Ciccone, 123 So.3d at 606.
As to the definition[1] of “manifestation,” R.J. Reynolds initially requested that the jury be instructed as follows:
The first issue' for your determination is whether the decedent George Ciccone had peripheral vascular disease (PVD) *1032 that first manifested itself on or before November 21,1996.
For this purpose, “manifested” means either that there was a diagnosis of “PVD” or that .the smoker experienced symptoms sufficient to put a reasonable person on notice that there was a potential connection between his symptoms of “PVD” and cigarette smoking.
(Emphasis added.)
Then, in the amended proposed jury instructions, R.J. Reynolds requested the following similar instruction as to “manifestation” of the tobacco-related illness:
Plaintiff must also prove by .the greater weight of the evidence that Mr. Gic-cone’s peripheral vascular disease or “PVD” manifested prior to November 21,1996.
“Manifested” means either there was a diagnosis of “PVD” or there were symptoms of “PVD” that would put a reasonable person on notice that there was a connection between the “PVD” and cigarette smoking.
(Emphasis added.)
The trial. court declined to use R.J. Reynolds’ proposed instructions that included a requirement that, in order to find that Mr. Ciccone’s PVD “manifested” prior to November 21, 1996, “a reasonable person” would have been on notice of the causal connection between smoking and his condition. Instead, the trial court instructed the jury that “manifestation” occurred when Mr. Ciccone “experienced symptoms of [PVD] or was diagnosed with [PVD].”
Specifically, the trial court instructed the jury as follows:
. The second question on the verdict is: Did George Ciccone’s peripheral vascular disease (PVD) manifest itself prior to November 21st, 1996?
In this case “manifest” is defined as the time when Mr. Ciccone experienced symptoms of peripheral vascular disease or was diagnosed with peripheral vascular disease.
(Emphasis added.)
The special interrogatory verdict asked the following three questions, all of which the jury answered in the affirmative:
1. Was George Ciccone addicted to cigarettes containing nicotine, and if so, was that addiction a legal cause-of his peripheral vascular disease (PVD)?
If your answer to Number 1 is Yes, proceed to Number 2. If No, your verdict is for the defendant on this issue. Please proceed to Number 3.
,2. Did George Ciccpne’s peripheral vascular disease (PVD) manifest prior to November 21,1996?
If your answer to Number 2 is Yes, proceed to Number 3. If No, your verdict is for the defendant on this issue. Please proceed to Number 3.
3. Did George Ciccone have lung cancer caused by smoking, and if so, was that lung cancer a legal cause of his death?
It was undisputed that Mr. Ciccone’s PVD was not diagnosed until after the November 21, 1996, cut-off date for Engle class membership. Thus, pursuant to the trial court’s definition of “manifestation,” the issue of membership in the Engle class turned on whether Mr. Ciccone had experienced any symptoms of PVD before the November 21, 1996, cut-off date for class membership. As the Fourth District noted, the trial court “emphasized that Cic-cone could meet this burden only through expert testimony, and could not rely ‘just in general [on] any symptomology that some layman could take to’ be one ailment or another.” Ciccone, 123 So.3d at 607.
During Phase I of the trial, R.J. Reynolds and Ciccone advanced differing interpretations of the competing expert testimony presented to prove “manifestation” *1033 of Mr. Ciecone’s PVD. The jury ultimately decided the issue of Engle class membership in favor of Ciccone, and the relevant facts are not in dispute for purposes of the legal issue before this Court; The Fourth District set forth those facts as follows:
Ciccone’s Case as to “Manifestation” To establish the deceased’s manifestation of PVD caused by smoking, Ciccone called two expert witnesses: Dr. Michael Hirsch, the deceased’s treating physician, and Dr. Allan Feingold, the deceased’s pulmonologist. Dr. Hirsch characterized the deceased as a “very difficult” and “tough” patient, in that it was “difficult to convince [him] to take advice from physicians.” When the deceased first arrived at the doctor’s .office in 1988, Dr. Hirsch described him as “relentless” in his chain smoking,'routinely smoking three to four packs of cigarettes per day. By April 6, 1990, Dr. Hirsch diagnosed the deceased as having a nicotine addiction and recommended that he use certain medication and nicotine patches.
On June 27, 1991, the deceased returned to Dr. Hirsch’s office complaining of “chronic back pain,” with such pain radiating down his leg and • hip. The doctor performed an MRI scan and an x-ray of the deceased’s lumbar spine. The scan showed, among other things, the existence of spondylosis and vascular sclerosis, common signs of early stage PVD. Nevertheless, Dr. Hirsch testified that “nothing was done about it” because the deceased “wasn’t having any symptoms ... at the time” since the disease “takes a long time to develop,” particularly where it attacked the aortic area, as it did in the deceased.
From 1991 through 1998, the deceased managed to airoid doctors and his condition continued to worsen. A co-worker of the deceased from 1994 through 1995 testified that the- deceased- had trouble using ladders and walked with a noticeable limp, persistently favoring his right side. Due to such problems, when carpooling, the deceased would request the co-workers to drop him off close to their place of- employment so he would not have to walk a great distance. Likewise, the deceased’s stepson testified that by the time of the stepson’s 1995 wedding, the -deceased’s leg issues had worsened to the point that he had difficulty getting up stairs and could not even dance with the bride.
In 1998, the deceased- reported the problems to his doctors, at which point he was sent.to a neurosurgeon to address his back problems. From there, he also went to a vascular surgeon to address his “claudication problems,” which Dr. Hirsch described as “pain that occurs ... with exertion that’s due to [PVD,] narrowing of the artery, [and] lack of blood flow to the area.” By 1999, the deceased was finally diagnosed as having PVD; to address the disease, he then had bypass surgery, which cleared up much of the symptoms that had manifested in his leg.
Dr. Feingold corroborated much of Dr. Hirsch’s observations, testifying that the deceased’s first manifestation of PVD was evidenced by the 1991 lumbar spine x-ray, even though this only showed a “soft” condition. Thereafter, Dr. Feingold opined that by 1994 through 1995, the pain the deceased experienced in his right leg while walking, as described by the co-worker and stepson, was consistent with symptoms of intermittent claudication caused by PVD.
Additionally, Dr. Feingold testified that by the time the deceased finally had bypass surgery in 1999, his PVD had reached a “serious” state of late stage development, evidenced by the fact that he was exhibiting no blood flow below the inguinal zone. This level of “seriousness,”-in Dr. -Feingold’s opinion, was *1034 extremely- important to pinpointing when the “manifestation” of the disease occurred, since such a level of PVD takes “at least more than five years” to develop. Although Dr. Feingold later admitted on cross examination that the deceased never exhibited the classic first signs of PVD, he opined that the deceased’s back injuries made subséquent symptoms appear “misleading.”
The Defense’s Case
R.J. Reynolds called Dr. David Charles Brewster, a vascular surgeon, who opined that the deceased’s PVD symptoms first arose in early 1998. To support his opinion, Dr. 'Brewster' described PVD as “a thickening deposit on the wall of the artery, which, if ⅛ progressively worsens, will begin to narrow the artery.” In conjunction with this definition, Dr. Brewster explained that the earliest sign of PVD is a claudication, which takes effect only when one is either walking or exercising. Thereafter, once the PVD gets worse, the patient will lose his pulse along with the hair on his extremity.
As applied to this case, Dr. Brewster stated that the deceased was not suffering from PVD prior to 1998, since, during that time, the pain he felt was present both when he walked and while he was at rest. Dr. Brewster bolstered his opinion by observing that the deceased failed to show many of the telltale signs of PVD, such as loss of hair on his extremity, short or thin appearance' of the skin, or loss of pulse in the ankle. As a result, Dr. Brewster opined that the pain the deceased felt in his leg during this time was attributable to his back problems, particularly a ruptured disk and nerve root compression.
Id. at 607-08.
After the conclusion of Phase I of the trial, R.J. Reynolds moved for a directed verdict, contending that Ciccone had “failed to present sufficient evidence to establish her membership in the Engle class.” Id. at 608. The trial court “decided to submit the fact question of class membership to the jury,” which ultimately found- Ciccone to be a member of the En-gle class. Id.
The trial then proceeded to a “Phase II,” during which “the jury was tasked with décidíng whether R.J. Reynolds was liable under Ciccone’s compensatory damages claims, and whether Ciccone was entitled to punitive damages. The jury found in favor of Ciccone on her claims of negligence, strict liability, and gross negligence/’ Id. The jury rejected, however, the fraudulent concealment and civil conspiracy claims that it was asked to decide, finding in favor of R.J. Reynolds on those issues. Id.
As to damages, the jury awarded Cic-cone $196,222.35 for medical and funeral expenses and $3,000,000.00 in noneconomic compensatory damages.- Id. In addition, the jury found by clear and convincing evidence that punitive damages were warranted and awarded Ciccone $50,000.00 in punitive damages on her-claim of gross negligence. Id.' at 608-09. Pursuant to the jury’s apportionment of 70% of comparative fault to Mr. Ciccone, the trial court entered a final judgment against R.J. Reynolds in the amount of $1,008,866.70. Id. at 606.
On appeal to the Fourth District, R.J. Reynolds argued “that the trial court twice erred in handling the issue of Ciccone’s class membership” — first, by “erroneously instructing the jury that the deceased’s manifestation of PVD occurred when he had ‘symptoms’ of the disease, instead of when the deceased was on notice of the causal connection-between his smoking and his PVD”; and, second, “by failing to grant a directed verdict in the defense’s favor *1035 since Ciccone failed to present any competent evidence that the deceased’s PVD ■manifested prior to November 21, 1996.” Id. at 609. R.J. Reynolds also challenged the award of punitive damages under the gross negligence theory, on the basis that punitive damages for gross negligence were not pled in the original Engle class action and therefore were unavailable for this claim. Id. at 616.
The Fourth District, affirmed “in all respects but one,” rejecting in full, R.J. Reynolds’ arguments on the “manifestation” issue and reversing only the award of punitive damages. Id. at 606. The Fourth District held that the trial, court correctly instructed the jury regarding the “manifestation” of Mr. Ciccone’s PVD for the purpose of determining Engle class membership because,‘“it is "enough that the decedent have suffered a medical condition that first’ became symptomatic before November 21, 1996.” Id. at' 614 (internal citation omitted).' As to the denial of R.J. Reynolds’ motion for a directed verdict, the Fourth District also affirmed, concluding that the jury was not reqüired to accept the defense’s expert testimony that Mr. Ciccone’s pre-November 1996 symptoms were not attributable to PVD. Id. at 616.
The only error recognized by the Fourth District was “in allowing Ciccone to recover punitive damages under the theory of gross negligence since that cause of action was not pled in the original Engle class case and the' jury found for the defense on the concealment and conspiracy claims.” Id. On the punitive damages issue, the Fourth District adopted the First District’s analysis in Soffer v. R.J. Reynolds Tobacco Co., 106 So.3d 456, 460 (Fla. 1st DCA 2012), quashed, 187 So.3d 1219 (Fla. 2016), “which held that Engle progeny plaintiffs may recover punitive damages only on claims for concealment or conspiracy.” Ciccone, 123 So.3d at 616.
Accordingly, the Fourth District affirmed the final judgment in all aspects other than as to punitive damages and remanded to the trial court for the entry of a final judgment that eliminated the $50,000.00 punitive damages award. Id. at 617. The Fourth District also certified conflict with the First District’s decision in Castleman, 97 So.3d at' 877, -in which the First District held that a disease or condition “manifests” itself as-a tobacco-related illness for the purpose of Engle cláss membership .only when the plaintiff knew or reasonably should have known of the causal connection between tobacco and the illness so as to be able to. initiate a non-frivolous tort lawsuit against the tobacco company on the basis of physical, observable symptoms. Ciccone, 123 So.3d at 617.
ANALYSIS'
The certified conflict issue in this case involves defining “manifestation” of the plaintiff’s tobacco-related disease or medical condition for purposes of establishing membership in ,the Engle class. This Court’s standard of review' for this purely legal certified conflict issue and our determination of the correct definition of “manifestation” for Engle class membership is de novo. See Engle, 945 So.2d at 1274 (“Questions of. law are reviewed de novo.”).
In analyzing this issue, we begin with this Court’s decision in Engle, which sets forth the background and necessary framework for considering the proper definition of “manifestation.” Then, we address why R.J. Reynolds’ arguments regarding statute of limitations principles and “opt-out” rights are inapplicable in this, context. We conclude by explaining why the Fourth District’s approach is consistent,^with Engle. ■
*1036 I. This Court’s Decision in Engle
Determining the scope of Engle class membership must begin with how this Court described the class in our 2006 decision from which this progeny case originates. In Engle, 945 So.2d at 1274-75, this Court rejected the class plaintiffs’ argument that the class could be “open-ended.” We agreed with the tobacco companies that there was a “cut-off date” for class, membership rather than an open-ended class and stated that the “plain language of the class certification indicates that the trial court anticipated that the class would be cut off or limited to the date of final certification.” Id. at 1275. This Court stated that it'was “reasonable” to conclude that “the date of the trial court’s November 21, 1996, order that’re-certified a narrower class is the appropriate cut-off date” for class membership. Id. at 1255,1275.
As we stated, “the class is described as those ‘who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine.’” Id,'at 1275-76 (emphasis omitted) (quoting Engle, 672 So.2d at 40). “The phrase ‘who have suffered, presently suffer or have died’ supports the view that the class should include only those people who were affected in the past or who were presently suffering at the time the class was recerti-fied by the trial court.” Id. at 1275.
In discussing the cut-off date, this Court emphasized that diagnosis of the tobacco-related disease or medical condition was not the “critical event” for establishing class membership. . Id. at 1275-76. Specifically, according to this Court’s opinion, the “critical event is not when an illness was actually diagnosed by a physician, but when the disease or condition first manifested itself.” Id. at 1276 (second emphasis added). Indeed, this Court noted that “ ‘diagnosis’ as a qualifying factor does not appear anywhere in the description of the class certified.” Id. at 1275.
This Court’s discussion of class representative Della Vecchia is' instructive in considering the necessáry showing for establishing Engle class membership. According to this Court, “Della Vecchia’s medical records indicate that she had been suffering from a tobacco-related disease prior to the time of certification,” and was therefore “properly included as a class member.” Id. at 1276 (emphasis added). In addressing Della Vecchia’s membership in the Engle class, this Court pointed to notations by Della Vecchia’s doctors of having “a past medical history of ‘COPD’ and ‘ significant hypertension” in “early 1997.” Id.
. Significantly, nowhere .did this Court state that, to establish Engle class membership, Della Vecchia was required. to have knowledge that her symptoms were caused by smoking. Indeed, there was no indication of when Della Vecchia even knew of her symptoms, and this Court required nothing more than medical records indicating that “she had been suffering from a tobacco-related disease” prior to the “cut-off’ date. Id.
In holding that “manifestation” of the tobacco-related disease or medical condition is the determining factor for Engle class membership, this. Court was cognizant of crafting a “finite class,” rather than one that was “open-ended.” Id. at 1274-75. “A finite class is necessary,” this Court explained, “to avoid multiple similar lawsuits and to make legal process more effective and expeditious, important goals of a class action suit.” Id. at 1275. This Court thus imposed a “cut-off date” of November 21,1996. Id.
Nowhere in Engle did this Court hold that establishing class membership required any type of knowledge regarding the connection between smoking and the *1037 disease or medical condition prior to November 21, 1996. Rather, this Court consistently referred to whether the plaintiff was “suffering from a tobacco-related disease” before the class was recertified by the trial court on November 21, 1996, as the “critical event” in establishing whether the disease or condition had' “manifested itself.” Id. at 1275-76 (emphasis added).
The issue of class membership became especially important in light of this Court’s approach to the Engle litigation since our 2006 decision. In particular, this Court held in Engle that “continued class action treatment” was “not feasible” and that the class must therefore be decertified to allow each class member the opportunity to file an individual lawsuit against the tobacco companies to determine entitlement to compensatory and punitive damages. Id. at 1277.
However, this Court “did not decertify the class in the traditional sense,, but conferred upon the class members two benefits: (1) each class member’s time to file an individual suit would be equitably tolled to allow filing within one year of the court’s decision, and (2) in the individual action, the Engle jury’s ‘common core findings’ in Phase I would be given ‘res judica-ta effect.’ ” Ciccone, 123 So.3d at 609-10 (quoting Engle, 945 So,2d at 1269). Determining Engle class membership thus became critical in progeny cases after this Court’s decision because only individual plaintiffs “within the class” as of the trial court’s November 21, 1996, order were permitted to use the “res judicata” effect of the Engle jury’s Phase I common core findings. Engle, 945 So.2d at 1277.
II. The Certified Conflict
R.J. Reynolds advances' two primary arguments before this Court as to why the Fourth District allegedly ¿rred in concluding that there is no knowledge requirement for establishing “manifestation.” First, R.J. Reynolds asserts that the Fourth District erred in rejecting well-settled principles from the statute of limitations context, which derive from “creeping disease” cases and require the plaintiff to have knowledge of the causal connection between the symptoms and'the cause of action. Second, R.J. Reynolds contends that the Fourth District’s decision undermines the ability of a plaintiff to exercise any meaningful “opt-out” right, in contravention of Engle and class actions more generally. We address each argument in turn.
A. Statute of Limitations Principles Do Not Apply
As to R.J. Reynolds’ first argument, we conclude that statute of limitations principles are inapplicable to the .“manifestation” issue of Engle class membership.' The Fourth.District directly and persuasively addressed this issue, explaining why the policy concerns driving cases involving the accrual of a cause of action for statute of limitations purposes have no bearing on the policy for requiring “manifestation” to prove membership in the En-gle class. Reviewing this Court’s decision in Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932 (Fla.2000), a “creeping disease” case relied on by R.J. Reynolds and the dissent, the Fourth District stated thát the policy behind requiring knowledge in the statute of limitations context “reflects common sense,” as “it is both illogical and unfair for the statute to begin to run before the plaintiff knows, or should have known of the causal connection that is the basis for his suit.” Ciccone, 123 So.3d at 611.
Indeed, while R.J.- Reynolds and the dissent place much emphasis on Carter and-the “creeping disease” line of cases, the rationales of those cases in resolving statute of limitations issues are not, as R.J. Reynolds contends, easily transplanted to the issue of Engle class membership. In *1038 Carter, 778 So.2d at 934, this Court held that the statute of limitations begins to run in a products liability cause of action involving a “creeping disease” when “the accumulated effects of the deleterious substance manifest themselves to the claimant in a way which supplies some evidence of a causal relationship to the manufactured product.” This Court based its holding in Carter on what the Fourth District in Cic-cone accurately described as “concerns about fairness to the plaintiff.” Ciccone, 123 So.3d at 611.
Specifically, .Carter and other “creeping disease” cases, by their very nature, involve latent illnesses that are acquired “as a result of long-term exposure to injurious substances,” where the deleterious effects that give rise to the cause" of action may not become symptomatic for many years after the initial exposure. Carter, 778 So.2d at 936-37. For this reason, “the* connection between a plaintiffs initial symptoms and a defendant’s conduct can remain unknown until reaching a later stage of worsened development.” Ciccone, 123 So.3d at 610.
A “creeping disease” presents unique problems in the statute of limitations context, where a plaintiff in Florida has only four years to bring a products liability claim “from the date that the facts giving "rise to the'cause of action were discovered; or should have been discovered with the exercise of due diligence.” §§ 95.031(2)(b), 95.11(3), Fla. Stat. Yet, it is clear that a plaintiff should not, and cannot, be required to file a cause of action before even realizing that the cause of action exists. Such a rule would, as the Fourth District cogently articulated, completely undermine the purpose of statutes of limitations:
[I]n the context of “creeping diseases,” the requirement of knowledge of the ■causal connection .between the infirmity and the product is-grounded in balancing fairness to the plaintiff with the policy driving the statute of limitations. The primary purpose of a statute of limitations is to compel the exercise of a right of action within a reasonable time “to protect defendants from unfair surprise and stale claims.” Major League Baseball v. Morsani 790 So.2d 1071, 1074-76 (Fla.2001); see 35 Fla. Jur.2d, Limitations and Laches § 1 (2013). If courts were to find that “creeping diseases” “manifest” at first sign of “symptoms,” such policy would be disserved, as the statute of limitations would bar plaintiffs from pursuing fruitful causes of action before the plaintiff even knows enough “to commence a non-frivolous tort lawsuit.” Frazier [v. Philip Morris USA, Inc., 89 So.3d 937, 946 (Fla. 3d DCA 2012) ].
Ciccone, 123 So.3d at 612.
Unlike the statute of limitations context, where the statute itself actually requires á reasonable plaintiff to know of the existence of the cause, of action, there is no corresponding policy concern underlying the establishment of membership in the Engle class. This Court has clearly held that diagnosis of the tobacco-related disease or medical condition is not required in order to be included- in the Engle class. As the Fourth District explained, the deadline imposed by this Court for keeping the class from becoming “open-ended” was. not “tied to the plaintiffs knowledge.” Id. at 613. Instead, “all a plaintiff had to show was that he or she was .included among ‘those people who were affected in the past or who were presently suffering at the 'time the class was recertified by the trial court.’” Id. (quoting Engle, 945 So.2d at 1275).
Placing a burden: on the plaintiff to have knowledge of the causal connection between symptoms and smoking would, thus, actually require the plaintiff to know as *1039 much or more than a medical professional — that is, only plaintiffs with a competent doctor who is able to quickly link the correct illness with smoking, or those plaintiffs who are particularly sophisticated on their own, would be able to establish class membership. Again, this is a point the Fourth District clearly recognized:
[A]s shaped by the Supreme Court under the unique circumstances of Engle, the question of class membership is a fact issue viewed with the benefit of hindsight from the vantage point of 2006, where expert testimony may establish the link between a plaintiffs concrete symptoms and- tobacco; class membership is not an inquiry into the abstraction of what a plaintiff knew or should have known over ten years earlier. The unfairness to a plaintiff that informs the knowledge requirement of the statute of limitations cases is absent in this scenario. The term “manifested” as used in Engle has a narrower definition than that given to it in Castleman. As the plaintiff argues in her brief, the Supreme Court’s use of the term “manifested” in Engle signifies an “event that is neither dependent on the skill of the [treating] physician nor the sophistication of the patient — it is enough that the decedent have suffered a medical condition that first” became symptomatic before November 21,1996.
Id. at 613-14.
Simply put, the policy undergirding the “manifestation” of an injury for the accrual of a cause of action is not the same as the policy rationale for the “manifestation” requirement to establish Engle class membership. Accrual is simply not the relevant inquiry for determining Engle class membership. If anything, the ' concerns about fairness -to the plaintiff that drive the knowledge requirement for purposes of the statute of limitations actually compel the opposite result■ here. Because R.J. Reynolds’ argument regarding statute of limitations principles “fails to take into account the differences in policy between the -accrual of a cause of action for the purpose of- the statute of limitations and pinpointing a date for class membership by looking back in time from the 2006 Engle decision,”' id. at 613, this argument is uná-vailing as a justification for rejecting the Fourth District’s definition.
B. The Fourth District’s Definition . is Consistent with Engle
R.J. Reynolds also contends that the Fourth District’s interpretation of “manifestation” is erroneous because it is inconsistent with the “opt-out” rights of a plaintiff in a class actiqn lawsuit, in that a plaintiff with no reason to know that he or she is included in the class could not meaningfully determine whether to join the class and be bound by any final judgment or whether to “opt-out” and proceed individually against the defendant in a separate cause of action. In support.of this argument, R.J. Reynolds points to an order .entered by the Engle trial court in January 1998, in which the trial court stated that class members must be “residents of the state of Florida at the. time of [the] medical diagnosis or at the time [the] evidence of the causal relationship of the cause of action had manifested, ifself.” R.J. Reynolds contends that this order demonstrates that, in.order to exercise a meaningful right to “opt out,” the potential Engle class member must- have known about the connection'between smoking and his -or her symptoms, particularly when considered in conjunction with the trial court’s November 1996 notice informing Florida smokers that they were not members of the Engle class if they had “not manifested or been diagnosed with any disease br medical condition caused by [their] addiction to cigarettes that contain nicotine.”
*1040 As Ciccone points out, however, the trial court’s January 1998 order concerned the accrual of the cause of action for determining the proper choice of law — in other words, this order invokes the inapplicable statute of limitations principles that have no impact on the issue of Engle class membership. Moreover, R.J. Reynolds’ citation to the trial court’s orders does not assist in analyzing the “manifestation” issue because R.J. Reynolds reads a knowledge requirement into the definition that simply is not there. “Rather, the requirements for class membership are: (1) that the plaintiff was a Florida resident, (2) that he or she either suffered or was suffering from a smoking related illness before November 21,1996, and (3) that his or her addiction to nicotine caused the disease.” Ciccone, 123 So.3d at 614. The “key point in determining Engle class membership,” as stated by the Fourth District based on the correct interpretation of this Court’s decision in Engle, “is pinpointing when the plaintiff began ‘suffering’ from the smoking-related illness.” Id. at 615 (quoting Engle, 945 So.2d at 1275).
In any event, the trial court orders cited by R.J.' Reynolds are not dispositive for the additional reason that this Court’s 2006 Engle decision is the’ pertinent point of reference for defining the scope of the Engle class in progeny cases. This Court clearly held that the class included “those people who were affected in the past or who were presently suffering at the time the class was recertified by the trial court.” Engle, 945 So.2d at 1275. That definition did not include any requirement of knowledge — only a requirement of past or present “suffering” of tobacco-related symptoms.
Further, the current procedural posture of the litigation, where the class was actually decertified moving forward, differentiates Engle progeny cases from typical class actions. The Engle class was closed by. this Court’s Engle decision itself. While -R.J. Reynolds, echoed by the dissent, contends that defining “manifestation” without reference to knowledge of causality would violate potential class members’ right of access to the courts and eliminate the “mutuality” necessary for the Engle jury’s Phase I findings to be given preclusive effect — because it would expand the class too broadly — this Court already clearly defined the parameters of the “finite class” in Engle to avoid these concerns. Id.
The Engle class could have continued for even longer than the date of the trial court’s recertification order — indeed, this Court explicitly noted in Engle that the “final class description could lead one to believe that the class is open-ended because there is no stated cut-off date for membership.” Id. ■ at 1274. But this Court declined to permit such an “open-ended” class, recognizing the date of final class certification as the “cut-off date for class membership,” in order to “avoid multiple similar lawsuits and to make legal process more effective and expeditious, important goals of a class action suit.” Id. at 1275. It was in this context of explaining why the class could not be “open-ended,” and not in the context of explaining the necessary “manifestation” of symptoms, that this Court referenced the access to courts and “mutuality” issues R.J. Reynolds now improperly attempts to rely on.
For similar reasons, R.J. Reynolds’ reliance on Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and alleged federal due process concerns, are also misplaced. R.J. Reynolds cites to Amchem Products in asserting . that, the “Fourth District’s extension of Engle class membership to individuals who had no reason to know they might have a smoking-related condition rendered meaningless the notice and *1041 opt-out rights protected by the Florida Rules of Civil Procedure and by the state and federal constitutions.” In particular, R.J. Reynolds asserts that the Supreme Court in Amchem Products' “rejected a class certification in an. asbestos case that included exposure-only plaintiffs who .‘may not even know of their exposure, or realize the extent of the harm they may incur.’ ” 521 U.S. at 628, 117 S.Ct. 2231.
But, in Amchem Products, the United States Supreme Court confronted a class much different than the Engle class. It was a class described by the Supreme Court as “sprawling” — the very type of “open-ended” class this Court was careful to avoid in Engle, 521 U.S. at 622; 117 S.Ct. 2231. And, because the Supreme Court concluded that the clasá 'in Amchem Products could not “satisfy the requirements of common issue predominance and adequacy of representation,” the Supreme Court did not “definitively” rule on the notice provided. Id. at 628,117 S.Ct. 2231. There were, in addition, numerous other factors present in Amchem Products, not present in Engle, ■ that impacted the Supreme Court’s decision, including that the class was for settlement purposes only, id. at 620, 117 S.Ct. 2231 and that the class members would be bound by the settlement even though they were not suffering from any disease, id. at 628, 117 S.Ct. 2231. Accordingly, Amchem Products is wholly distinguishable.
In sum, this Court carefully limited the “finite class” in Engle to ensure that class membership was not “open-ended.” En-gle, 945 So.2d at 1274-75. There remain numerous limitations on the scope of the class, including the statute of limitations, the one-year time bar set forth by this Court for filing an individual actipn based on Engle, Florida residency, and the requirement we address here that the smoker “ha[d] suffered” or be “presently suffering” from a tobacco-related disease or medical condition at the time the class was recertified by the trial court. See id. at 1275-77. Knowledge of the causal link between smoking and the symptoms that the smoker previously “suffered” or was, at that time, “presently suffering,” was not required by Engle, and R.J. Reynolds has offered no compelling reason this Court should now hold that a plaintiff must establish this additional element in order to prove class membership.
CONCLUSION
For the reasons explained in this opinion, we hold that “manifestation” for purposes .of establishing membership in the Engle class is defined as the point at which the plaintiff began suffering from or experiencing symptoms of a tobacco-related disease or medical condition. Under the definition we adopt, the plaintiff does not need to have been formally diagnosed or know that the symptoms were tobacco-related prior to the “cut-off date” for class membership.
Accordingly, we approve the Fourth District’s definition of “manifestation” in Cic-cone and disapprove the definition applied by the First District in Castleman. We, however, quash the portion of the Fourth District’s decision regarding punitive damages based on our opinion in Soffer v. R.J. Reynolds Tobacco Co., 187 So.3d 1219 (Fla.2016). This ease is hereby remanded to the Fourth District'for further proceedings consistent with this opinion and bur opinion in Soffer.
It is so ordered.
LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, J,, concurs.

. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.

. We quash the portion of the Fourth District’s decision regarding punitive , damages based on our opinion in Soffer v. R.J. Reynolds Tobacco Co., 187 So.3d 1219 (Fla.2016) (holding individual members of the Engle, class are not prevented from seeking punitive damages on all claims properly raised in their subsequent individual actions following this Court's decertification of the class action in Engle).